## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

Edward Scot Husbands, )
)
Appellant, )
)
v. )    C.A. No.: N18A-04-009 JRJ
)
Delaware Department of )
Education and Delaware )    **REDACTED**
Professional Standards )
Board, )
)
Appellees. )

Date Submitted: April 10, 2019
Date Decided: July 8, 2019
Date Redacted: July 19, 2019

## OPINION

Upon Appeal from the Professional Standards Board: **AFFIRMED**.

Anthony N. Delcollo, Esq., G. Kevin Fasic, Esq., Katherine Witherspoon Fry, Esq., Offit Kurman, P.A., 1201 N. Orange Street, Suite 7257, Wilmington, Delaware 19801, Attorneys for Appellant.

Patricia A. Davis, Deputy Attorney General, Delaware Department of Justice, 102 W. Water Street, Dover, Delaware 19904, Attorney for Appellees.

**Jurden, P.J.**

# I. INTRODUCTION

Appellant Edward Scot Husbands ("Husbands") appeals a decision of the Professional Standards Board ("PSB") revoking Husbands' professional licenses as a teacher and administrator. Husbands' appeal is opposed by appellees the Delaware Department of Education ("DOE") and the PSB. As explained below, because the Court finds that the PSB's decision is supported by substantial evidence, is not based solely on hearsay, and is free from legal error, the PSB's decision is **AFFIRMED**.

# II. BACKGROUND AND PROCEDURAL HISTORY

On June 25, 2015, Husbands, a Milford School District ("MSD") administrator, was arrested and charged with multiple counts of unlawful sexual contact with a person under the age of thirteen in violation of 11 *Del. C.* § 769 and Endangering the Welfare of a Child in violation of 11 *Del. C.* § 1102.[1] On June 27, 2015, the Executive Director of the Delaware Criminal Justice Information System ("DELJIS"), notified the MSD Personnel Director, Dr. Paul Walmsley, of the charges against Husbands. Attached to that notice was a DELJIS Charge Summary and a copy of the Complaint and Warrant and the Affidavit of Probable Cause.[2] On

---

[1] Record at 2008 [hereinafter "R."].
[2] *Id.*; DOE Ex. 13.1-13.5 (DELJIS Charge Summary); DOE Ex. 14.1-14.7. The alleged victims listed in the criminal Complaint and Warrant and the Affidavit of Probable Cause are three young girls. At the time of the alleged crimes, Child 1 was 10 years old, Child 2 was 8 years old, and Child 3 was 10 years old. *See* DOE Ex. 14.1-14.7. According to the Complaint and Warrant: Husbands attempted to touch Child 1's vagina by touching the inner crease of her thigh in December 2014; placed his hand under Child 2's underwear and touched her vagina between April

2

June 29, 2015, Dr. Walmsley notified Husbands by letter that he was suspended without pay effective June 29, 2015 based on "misconduct which is the subject of a pending police investigation."[3] On July 17, 2015, pursuant to 14 *Del. C.* § 1218(c), then Secretary of Education Mark Murphy suspended Husbands' license and standard certificates, effective June 25, 2015, the date of Husband's arrest.[4] On December 22, 2015, Dr. Walmsley notified Husbands by letter that:

> pursuant to [the] School Administrator Contract between the Board of Education of the Milford School District and [Husbands], Assistant Principal, dated December 16, 2014 and expiring on June 30, 2016, the Milford School District Board of Education is informing [Husbands] that said contract will not be renewed beyond the expiration date.[5]

In November 2016, Husbands was tried on the above criminal charges and a jury found him not guilty.[6]

On March 9, 2017, Secretary of Education Susan Bunting mailed a "Notice of License Revocation" to Husbands.[7] The Notice stated Secretary Bunting's intent to revoke Husbands' Continuing License and Standard Certificates in Teacher of Social

---

1, 2014 and June 30, 2015; and touched Child 3's vagina with his hand between June 1 and June 23, 2015. Husbands was also charged with crimes against a fourth victim, also a young girl, (Child 4) but the Record does not contain a Complaint and Warrant or an Affidavit of Probable Cause for those charges. Because the alleged victims are minors, the Court has assigned pseudonyms to them and their mothers to protect the children's privacy, and refers to them by those pseudonyms throughout this opinion.

[3] R. at 2009; *see also* DOE Ex. 15 (Dr. Walmsley's June 29, 2015 letter to Husbands).

[4] R. at 2008; *see also* DOE Ex. 18.2-18.3.

[5] DOE Ex. 17 (Dr. Walmsley's December 22, 2015 letter to Husbands).

[6] *See* H.O. Ex. 2; *see also* Op. Br., E-File 62230374, at 1.

[7] H.O. Ex. 1.

3

Studies Grades 9-12 (Valid 5-8 in a Middle School), Secondary Social Studies Teacher Grades 9-12 (Valid 5-8 in a Middle School), and Principal/Assistant Principal, based on Husbands' dismissal from his position with MSD for sexual offenses against a child.[8]

On April 4, 2017, pursuant to 14 *Del. C.* § 1218(k), Husbands submitted a written request for a hearing before the PSB to challenge the revocation.[9] The hearing ("Hearing") was conducted before a Hearing Officer (the "H.O.") on August 31, September 1, and September 5, 2017.[10] During the Hearing, the DOE presented testimony from ten witnesses and nineteen exhibits, which included multiple reports from the criminal investigation.[11] Husbands presented testimony from himself and Child 7, and four exhibits.[12] Before the H.O. rendered his decision, Husbands and the DOE submitted "Post Hearing Briefs and Closing Arguments" to the H.O.[13]

---

[8] *Id.*

[9] H.O. Ex. 2. In his request, Husbands stated:
> The stated rationale for the revocation is incorrect. The [MSD Board of Education] did not non-renew Mr. Husbands's contract "for sexual offenses against a child." Mr. Husbands's non-renewal letter does not even state that the [Milford School] Board was not renewing his contract for cause, much less state the cause. Nor was he accorded the hearing that is required by law if his contract was not renewed for cause, to establish whether there was any basis in fact for the non-renewal.

H.O. Ex. 2, at 2.

[10] R. at 1975. On June 12, 2017, the PSB notified the parties that it appointed a H.O. to preside over the Hearing. R. at 40-41.

[11] R. at 1977-78.

[12] R. at 2005.

[13] *Id.* at 1875, 1879-98 (DOE closing argument and briefing); R. at 1921-36 (Husbands' closing argument and briefing) (date appears to be incorrect); R. at 1956-68 (DOE Reply to Husbands' closing argument).

After considering the testimony, evidence, and counsels' post-Hearing submissions, the H.O. issued a "Decision and Proposed Order" dated November 21, 2017 (the "H.O. Decision"),[14] which included the following "Recommended Conclusions of Law."[15] First, Husbands was terminated or, alternatively, dismissed within the meaning of 14 *Del. C.* § 1218(b)(2) because the Milford School District Board of Education (the "MSD Board of Education") did not renew Husbands' administrator contract.[16] Second, Husbands was terminated or, alternatively, dismissed for sexual offenses against children.[17] Third, Husbands' request for attorneys' fees and costs should be denied because the DOE did not proceed in bad faith and the PSB does not have the authority to award such fees and costs.[18] The H.O. further recommended that the Secretary's proposed action to revoke Husbands' Continuing License and Standard Certificates be affirmed, and that pursuant to 14 *Del. C.* § 1218(b)(2), Husbands' Continuing License and Standard Certificates be revoked. Finally, the H.O. stated: "[i]n accordance with 14 *Del. C.* § 1218(o)(3), [Husbands] is ineligible to petition the Secretary for reinstatement of his license."[19] Following the H.O. Decision, Husbands and the DOE submitted memoranda to the PSB.[20]

---

[14] *Id.* at 1973-2022.
[15] *Id.* at 1974-2022.
[16] *Id.* at 2011.
[17] *Id.* at 2020.
[18] *Id.*
[19] *Id.* at 2022.
[20] *Id.* at 2064-71 (DOE's post-Hearing memo); R. at 2094-113 (Husbands' post-Hearing memo).

After considering the entire record, the PSB voted unanimously to adopt the H.O.'s Recommended Findings of Fact[21] and Conclusions of Law, and issued a "Final Order" on March 20, 2018, stating:

(1) Pursuant to 14 *Del. C.* § 1218(b)(2), and in accordance with 14 Del. Admin. C. § 1514-11.4, [Husbands'] Continuing License and Standard Certificates in Teacher of Social Studies Grades 9-12 (Valid 5-8 in a Middle School), Secondary Social Studies Teacher Grades 9-12 (Valid 5-8 in a Middle School), and Assistant Principal/Principal be revoked.

(2) Notice of the revocation of [Husbands'] Continuing License shall be made by the Secretary, or the Secretary's designee, to all chief state school officers of the other states and territories of the United States as required by 14 *Del. C.* § 1218(q).

(3) Pursuant to 14 *Del. C.* § 1218(o)(3), [Husbands'] Continuing License may not be reinstated.[22]

Husbands timely appealed the PSB's Final Order and this matter is now ripe for decision.[23]

---

[21] The PSB adopted the H.O.'s Recommended Findings of Fact "with the modification to the dates of Husbands' criminal trial." R. at 2134.

[22] R. at 2134-35.

[23] After reviewing the parties' briefs, the Court held a teleconference with counsel and requested supplemental briefing from the DOE relating to the Hearing testimony of the mothers of the alleged victims. *See* Superior Court Proceeding Worksheet, E-File 62665154, Nov. 13, 2018. Specifically, the Court asked the DOE to provide a statement of facts based on the non-hearsay evidence presented through the mothers' testimony. *Id.*

## III. HEARING EVIDENCE

The DOE presented the following evidence at the Hearing.[24]

Child 1[25]

At the time of the alleged offenses, Child 1 was ten or eleven and in fourth grade.[26] Child 1 and Child 7 were. They had numerous sleepovers, sometimes as often as every other weekend. During their sleepovers, the girls typically stayed at Child 7's house but sometimes stayed at Child 1's house.[27] Child 1 preferred sleeping over at Child 7's house because it was more fun, there was more to do, and she could stay up later. When she slept over, Child 1 typically arrived early Saturday

---

[24] In light of Husbands' argument on appeal that the PSB Final Order is not based on substantial evidence, the Court finds it necessary to provide a very thorough recitation of the evidence presented—hence, the fifty-five pages devoted to the Hearing evidence. Children 1-4, the four young girls who accused Husbands of inappropriately touching them, and who testified against him in his criminal trial, did not testify live at the Hearing. Instead, the transcripts of their sworn testimony from Husbands' criminal trial were submitted to the H.O., and portions of their trial testimony were read into the Record during the Hearing. R. at 974, 1265 (Hr'g Tr. at 139, 370) (hard copy of first two days Husbands' criminal trial transcript, including the sworn testimony of every witness, opening statements, and closing arguments, was admitted into evidence); *see also* R. at 1052-56, 87-93 (portions read into record). For reasons not clear to the Court, the first day of Husbands' criminal trial appears in the Record three times and the second day appears in the record one time. *See* R. at 475-644, 664-833, 1463-1632, 1670-1868. The H.O. reviewed the entire criminal trial transcript – not just portions of sworn testimony. When the DOE sought to introduce the first day of the criminal trial transcript, Husbands' objected, arguing that the entire transcript should be admitted, not just the first day of sworn testimony. On appeal, however, Husbands argues that while it was proper to admit the transcript as evidence, the PSB committed legal error because it relied solely on hearsay evidence to support its decision.

[25] R. at 595-621 (Child 1's sworn testimony from Husbands' criminal trial).

[26] According to the Complaint and Warrant, Child 1 was ten years old. *See* R. at 1458, 62 (DOE Ex. 14.3, 14.7). At the time of Husbands' criminal trial in November 2016, Child 1 was twelve years old and in the seventh grade.

[27] During the time of the alleged offenses and at the time of the Hearing, Child 7 lived with Husbands. *See* R. at 1247-56.

morning and left Sunday. The girls played games, talked, and went outside. At night, she and Child 7 slept on air mattresses in the living room and either Husbands or Mother 7 would sleep in the room with them. Mother 7 slept in the red recliner and Husbands slept on the air mattresses between Child 1 and Child 7.

In December 2014, during a sleepover at Husbands' house, Child 1 and Child 7 were on separate air mattresses in the living room watching "Taken." Child 1 said they started watching the movie around 8:00 p.m., which was later than normal. For the beginning of the movie, Mother 7 sat in the red recliner and Husbands laid on the air mattresses between Child 1 and Child 7. After a while, Mother 7 went to her bedroom to sleep. As the movie continued, Child 1 grew tired because it was later than her usual bedtime. At this point, Child 1 and Husbands were under the same blanket. According to Child 1, Husbands slid his hand between Child 1's legs and placed it on her thigh over her pajama pants. Husbands then began to slide his hand along Child 1's inner thigh without speaking and attempted to slide his hand up to Child 1's "girl area" and touch her front. Each time Husbands made an advance on Child 1, she pushed his hand away and tried to keep watching the movie. Child 1 could not tell if Child 7 was asleep during all of this because Husbands was between the girls. After pushing Husbands' hand away several times, Child 1 left the air mattress and started to walk around. To find an excuse to leave the living room, Child 1 went into Child 7's room and used the restroom. For the rest of the

sleepover, Child 1 refused to lie down and was afraid to fall asleep because she did not know what Husbands would do to her if she fell asleep.

At first, Child 1 did not tell anyone about the December 2014 incident because she was concerned about how people would react. In particular, Child 1 was concerned that Husbands might do something even worse to hurt the family, like ruining relationships. Then in the Spring of 2015, Child 1 told her parents. Her parents did not ask many questions because they were in shock. Child 1's parents took Child 1 to the Child Advocacy Center ("CAC") for an interview. Prior to the CAC interview, Child 1 did not talk to her parents about most of the incident. During the time between her CAC interview and Husbands' criminal trial, she did not talk to anyone about the incident or her criminal trial testimony.

Mother 1[28]

Mother 1 has known Husbands for almost twenty years. Husbands was married to her sister-in-law. Mother 1's children, Child 1 and her older brother, and Husbands' children were good friends and the families were close. Mother 1 and Mother 7 are close, and Mother 7 is like a sister to her because they have known each other for twenty-four years.[29] Mother 1's family went over to Husbands' house at least once a month and her children spent more time there than she or her husband.

---

[28] R. at 955-86 (Hr'g Tr. at 120-51).
[29] Mother 1 is married to Mother 7's brother.

9

During the summer, Child 1 and her brother spent most weekends at Husbands' house and sometimes stayed as many as three or four days a week. According to Mother 1, she and her husband often used Husbands and Mother 7 as babysitters.

In the Spring of 2014, Mother 1 noticed a difference in her children. In the past, Mother 1's children were eager to go to Husbands' house because Mother 7 was the "fun aunt."[30] But "it got to the point where [Child 1] really didn't want to go over there."[31] Mother 1 became upset because she could not understand why Child 1 no longer wanted to go to Husbands' house and Child 1 would not tell her why. According to Mother 1, the tension grew to the point where Mother 1 and Child 1 would argue about going to Husbands' house and she would "kind of make [Child 1] go."[32]

According to Mother 1, in December 2014, the situation between Child 1 and Husbands came to light. At a family party at her mother in laws' house, Mother 1 and all the adults (including Husbands) were sitting in the great room while the children were playing at a table in the kitchen. At some point, Child 1 left the kitchen and came into the great room to talk to Mother 1. Child 1 told Mother 1 that Husbands was texting her and "wanted her to come spend the night, that [Child 7]

---

[30] R. at 957-58 (Hr'g Tr. at 122-23).
[31] R. at 958 (Hr'g Tr. at 123).
[32] Id.

10

wanted her to come spend the night."[33] Mother 1 found this odd because she could not understand why Husbands would text Child 1 instead of talking to Mother 1, who was in the same room as Husbands. Mother 1 asked Child 1 if Child 7 had asked her to sleep over and Child 1 told her no.[34] Child 1 then told Mother 1 that she did not want to sleep over at Husbands' house. Mother 1 told her that it was fine and "we'll just say you are really tired, it has been a long day, and we will just go home."[35] When Child 1's family got home, Child 1 asked to talk to Mother 1. Child 1 and Mother 1 went into Child 1's bedroom and Child 1 began to cry. Mother 1 tried to calm her and asked Child 1 "what was going on."[36] Child 1 said that she did not want to go to Husbands' house anymore "[b]ecause I'm afraid of [Husbands]."[37] When Mother 1 asked why Child 1 was afraid of Husbands, Child 1 replied, "[h]e touches me."[38] After hearing this, Mother 1 was "in shock and taken back" and asked, "[h]ow did he touch you?"[39] Child 1 told Mother 1 that Husbands touched her inner thigh, girl area, and privates, and showed Mother 1 the area on her inner thigh.[40] Mother 1 calmed Child 1, went to get her husband, and had Child 1 tell her husband what Child 1 had just reported to Mother 1. Child 1 repeated what she said

---

[33] R. at 959 (Hr'g Tr. at 124.)
[34] *Id.*
[35] R. at 959 (Hr'g Tr. at 124).
[36] *Id.*
[37] *Id.* at 959-60 (Hr'g Tr. at 124-25).
[38] *Id.* at 960.
[39] *Id.*
[40] Mother 1 explained, "[g]irl area for our house was a region, upper inner thigh around." *Id.*

to Mother 1. Mother 1 and her husband calmed down Child 1 and put her to bed. Afterward, Mother 1 and her husband discussed what Child 1 said, but decided not to report it because her husband "felt that maybe [Child 1] was misunderstanding and . . . [they] needed to talk to [Husbands] first."[41] Mother 1 testified that she and the rest of the family knew the implications of reporting such accusations about an educator and "did not want to start anything that was a misunderstanding."[42]

Following Child 1's revelations, Mother 1's children did not go to Husbands' house from December 2014 to April 2015. Instead, Child 7 and her brother visited Child 1 and Child 1's brother at Mother 1's house. But during Spring Break in April 2015, Child 1 spent the night at the Husbands' house. According to Mother 1, Child 1 did not want to go, but went anyway to make Child 7 happy because Child 7 wanted her to come over. As a compromise, Mother 1 told Child 1 that she and her husband would wake up early the next day and come get her because Child 1 did not want to spend the whole next day at Husbands' house. When Mother 1 met Mother 7 at their usual drop-off spot, she told Mother 7 that Husbands made Child 1 uncomfortable but did not tell Mother 7 why. Mother 7 looked confused but said she would take care of it and took Child 1 back to her house for the sleepover.

---

[41] R. at 961.
[42] Id.

Early the following morning, Child 1 called Mother 1. Child 1 was crying hysterically and told Mother 1 that Husbands came into Child 7's bedroom the night before and laid down on Child 7's bed with Child 1 and tried to touch her again. Child 1 jumped up out of bed screaming and crying and ran into the living room to Mother 7.[43] Child 1 said that Husbands touched her on the leg, she pushed him off, and she got out of bed.[44]

Mother 1 and her husband went to Husbands' house. Mother 1 had her son take the other children outside so she and her husband could talk to Mother 7 about what happened. Mother 7 told Mother 1 that when the girls went to bed for the night, she locked Child 7's bedroom door and kept the key. During the night, Child 1 woke up to Husbands lying in bed with her and touching her leg. Child 1 ran screaming from the bedroom into the living room and woke up Mother 7 who was in the recliner. Mother 7 told Mother 1 that while talking to Child 1, out of the corner of her eye she saw Husbands leave Child 7's bedroom and go back to their bedroom. According to Mother 1, when Mother 7 went into their bedroom, Husbands pretended to be asleep. When Mother 7 asked him what was going on, Husbands told her that he had been in their room all night. Mother 7 told Mother 1 that Mother 7 went through his shorts, which were on the floor, and found a small screwdriver

---

[43] R. at 963-64 (Hr'g Tr. at 128-29).
[44] *Id.* at 964.

in a pocket. Mother 7 told Mother 1 she believed that Husbands used the screwdriver to unlock Child 7's door.

After Mother 1 and her husband spoke to Mother 7, Mother 1, her husband and Mother 7 called Husbands into the room to confront him and told him everything Child 1 reported. According to Mother 1, Husbands "stayed very calm and very cool, which I thought was odd."[45] Husbands told them that he did not understand where the accusations were coming from. He explained that on occasion he would pick up the girls (when they asked him) by their leg and arm and spin them around like airplanes and maybe that was when Child 1 thought he touched her. After this conversation, Mother 1's children never returned to Husbands' house and their family "pretty much cut all ties with [Husbands]," but remained in contact with Mother 7.[46]

According to Mother 1, Mother 7 called Mother 1 a week later from her parents' house and said that Child 7 told her no one wanted to sleep over at her house because her daddy touches them. Mother 1 went to Mother 7's parents' house, gave Mother 7 the number for Child Protective Services, and told her, "[i]f you don't make the call, I'm going to make the call."[47] Mother 1 stood in the garage while

_____

[45] R. at 965.
[46] R. at 965-66.
[47] R. at 966. It is unclear from the record how much time passed between Mother 1 and Mother 7's phone call and Mother 1 going to Mother 7's parents and telling Mother 7 to call Child Protective Services. *Id.*

14

Mother 7 made the call. After that, Child Family Services investigated Mother 1 and her husband for not reporting Child 1's accusations. According to Mother 1, the investigation determined that she and her husband were good parents and that their home was safe.

Mother 1 took Child 1 for a CAC interview. She was not allowed in the room during Child 1's interview and does not know what was said. Mother 1 was questioned about not reporting Child 1's accusations. Mother 1 was not present for Child 1's testimony at Husbands' criminal trial because Mother 1 was also a witness. Mother 1 said that testifying was extremely difficult for Child 1 and Child 1 went to counseling shortly after trial and at the time of the Hearing was still in counseling.

On re-cross examination, Mother 1 testified that she spoke with Child 7 and acknowledged that she previously testified she did not speak with Child 7. Mother 1 forgot she had a conversation with Child 7 the same day Mother 7 contacted Child Protective Services. Mother 1 took Child 7 for a walk and asked her if she told Mother 7 that nobody wants to stay over because her daddy touches them. Child 7 said "yes." Mother 1 asked Child 7 if she knew it was wrong and Child 7 said "yes." Mother 1 testified she did not tell Child 7 what to say and was not present when Child 7 testified during Husbands' criminal trial.

Child 2[48]

At the time of the alleged offenses, Child 2 was eight years old. Child 2 testified that she and Child 7 became friends in third grade and were in the same class. Mother 2 and Mother 7, who were seventh grade teachers at the same school, were friends. While in the third grade, Child 2 and Child 7 played with American Girl dolls, played school, made things out of dirt, and played on the same sports team. Child 2 and Child 7 talked about sports, maybe talked about family, and rarely talked about school. Child 2 and Child 7 had numerous sleepovers, which were usually at Husbands' house. They slept in Child 7's bedroom or in the living room on separate air mattresses. If they wanted to watch a movie or television, the girls slept in the living room.

In the spring of third grade, Child 2 and Child 7 had a sleepover at Husbands' house. They watched a movie in the living room and slept on separate air mattresses. Child 7's brother and Mother 7 also slept at the house that night. Child 2 was unsure whether Mother 7 slept in the red recliner in the living room. When Child 2 woke up around 8:30 a.m., Child 7 was still sleeping. At this time, Husbands came into the living room and laid down on the air mattress with Child 2, next to Child 7's air mattress. At first, Husbands talked to Child 2 about his cat, which was on the air mattress with Husbands and Child 2. Then Husbands' reached under Child 2's

---

[48] R. at 621-41.

16

blanket with his hand and started touching Child 2 over the front of her pajama pants. He moved his hand under Child 2's pajama pants and rubbed the front of her underwear. He then reached under Child 2's underwear and directly touched and rubbed Child 2's front. Husbands stopped touching and rubbing Child 2's front only when she asked to use the bathroom. Child 2 asked to use the bathroom because she felt uncomfortable. When Child 2 went to the bathroom, Child 7 woke up and she and Child 7 "hung out" for the remainder of the sleepover. Child 2 testified that she thought Child 7's brother was asleep during the entire incident because she did not see him. Child 2 testified that Mother 7 was cleaning somewhere in the house during the incident.

In the middle of fourth grade, Child 2 told Child 7 what Husbands did to her at the sleepover. Child 2 testified that she did not tell anyone else about the incident.

In June of 2015, Mother 2 took Child 2 to the CAC for an interview. Child 2 testified that on the way to the CAC Mother 2 told did not ask any questions but told Child 2 that the CAC had questions to ask her. On the drive home after the CAC interview, Mother 2 asked Child 2 questions about the CAC interview but it is unclear whether Child 2 answered the questions or what types of questions Mother 2 asked Child 2.[49]

---

[49] *See* R. at 1619-20, 1628-29.

Mother 2[50]

Mother 2 has been a middle school teacher in Milton, Delaware for ten years. Mother 2 and Mother 7 taught at the same school and were friendly because they worked together. They did not interact outside of school hours unless they had a school function. According to Mother 2, she and Mother 7 never really discussed their personal lives and did not want to get involved in each other's personal lives.

In the spring of 2015, Mother 7 told Mother 2 in passing that Mother 7 was having marital issues but did not provide any details. According to Mother 2, after Det. Truitt contacted her and informed her of the accusations against Husbands in June of 2015, any friendship she had with Mother 7 ended.[51]

When Child 2 was in third grade (2013-14), Child 2 and Child 7 were friends. Child 2 and Child 7 became friends while playing on the same soccer team. During their friendship, Child 2 and Child 7 had multiple sleepovers at Husbands' house. After the sleepovers, Child 2 never told Mother 2 that Husbands touched her. The girls were very close in third grade but Child 7 did not attend Child 2's birthday party in August, right before going into fourth grade. This broke Child 2's heart and Mother 2 stopped encouraging the friendship. According to Mother 2, Child 2 and

[50] R. at 1039-67 (Hr'g Tr. at 204-32).
[51] *See* R. at 1042-43, 1047-48 (Hr'g Tr. at 207-08, 212-13).

Child 7's friendship continued to dissolve in fourth grade because they were not in the same class, and the sleepovers stopped.

At the end of the school year in 2015, Detective Truitt contacted Mother 2 and informed her of the accusations of "sexual abuse in the home" against Husbands.[52] When she learned of the accusations, Mother 2 was shocked and could not believe "that anything like that could have possibly happened."[53] Mother 2 "thought [Husbands' house] was a safe place to send [her] children" because Husbands "was a school administrator" and Mother 7 "was a teacher."[54] Det. Truitt told Mother 2 that it was possible Husbands touched Child 2, but Mother 2 replied that she did not think it was possible because Child 2 would have told her. Mother 2 agreed to bring Child 2 in for a CAC interview "to rule it out."[55] During Child 2's CAC interview, Mother 2 remained in the waiting room. After the interview, Mother 2 was taken into a room with multiple people and was "quite surprised" when she was told that Child 2 said Husbands touched "her vaginal area on top of her clothes and then underneath of her clothes and in her underwear he touched her in her vaginal area."[56] When Mother 2 heard this she "completely lost [her] mind" and could not understand why Child 2 never told her.[57]

---

[52] R. at 1042-43 (Hr'g Tr. at 207-08).
[53] R. at 1043.
[54] *Id.*
[55] *Id.*
[56] R. at 1043-44.
[57] R. at 1044-45.

After learning about Child 2's statements, Mother 2 had to collect herself for about an hour before she talked to Child 2 about what happened. She did not want Child 2 to see her upset.[58] Once she collected herself, Mother 2 drove Child 2 home. During the car ride, Child 2 said Child 7 was a special friend and she did not tell Mother 2 because she was afraid to lose her friend.

Child 2 then told Mother 2 what happened. While Child 7 was still sleeping, Husbands came into the living room with a cat, sat down on her air mattress and started talking about the cat.[59] First, Husbands petted the cat, but then his hand moved to Child 2's leg and then his hand went under Child 2's blanket. Husbands touched her vaginal area and then touched her underneath her clothes. Mother 2 asked Child 2 how long it lasted. Child 2 could not give a definitive answer but said it was "a while." Mother 2 then asked when it stopped and Child 2 replied that Husbands stopped when she asked to go to the bathroom. Child 2 said it hurt when she went to the bathroom. During this conversation, Mother 2 told Child 2 that men are not allowed to touch her there, that what Husbands did was not okay and was a crime, and that he would pay for it. At some point, Child 2 told Mother 2 that when she talked to Child 7 about what happened, Child 7 told her that Husbands "has a hygiene and he likes to make sure everybody is clean."[60]

---

[58] *Id.* at 1045.
[59] *Id.*
[60] R. at 1061.

20

Mother 2 testified that during Husbands' criminal trial she told Child 2 to be cordial but to keep her distance and encouraged Child 2 not to be friends with Child 7. Mother 2 was present for Husbands' criminal trial but was sequestered during the alleged victims' testimony.[61]

According to Mother 2, testifying at Husbands' criminal trial was hard on Child 2 and she believes that Child 2 told the truth. Mother 2 stated that Child 2 currently is not in counseling because a counseling program professor told her counseling would retraumatize Child 2. Instead, the professor recommended Child 2 attend counseling in preparation for being a witness. Thus, Child 2 attended counseling from right before the criminal trial into sixth grade. Mother 2 also testified that her older daughter is "creeped out" by the whole thing because she is old enough to understand. Mother 2's husband also received counseling.

During her Hearing testimony, Mother 2 read a portion of Child 2's sworn trial testimony into the Record.[62]

---

[61] According to Mother 2, she was unable to testify at Husbands' criminal trial because she and her husband heard opening statements. *See* R. at 1047 (Hr'g Tr. at 212).

[62] R. at 1052-56; *see also supra* pp. 16-17.

21

Child 3[63]

At the time of the alleged offenses, Child 3 was ten years old. Child 3 and Child 7 met in fourth grade and were good friends. She remembers having four or five sleepovers at Husbands' house. She and Child 7 would sleep in Child 7's bed or in the living room on separate, but pushed together, air mattresses.

In May 2015, during one such sleepover, Child 3 and Child 7 slept in the living room on separate air mattresses. Child 3 slept on the larger air mattress and Child 7 slept on the smaller one. When Child 3 woke up the following morning, Husbands came into the living room and laid down on Child 3's air mattress.[64] Husbands reached over with his hand and touched her "butt" and "front." Child 3 tried to get Child 7's attention. Eventually, Child 3 got up and walked away from Husbands and Child 7 followed her.

After the incident, Child 3 did not want to talk to Mother 3 about it. Mother 3 took Child 3 to the police station for an interview, but Child 3 did not talk to the police officers. Mother 3 took Child 3 to the CAC for an interview but Child 3 did not talk to the interviewer. Then Carla Ennals, a social worker in the Department of Justice (the "DOJ") Victim Witness Unit, interviewed Child 3 and she finally talked about the incident.

---

[63] *See* R. at 532-41, 557-76.
[64] On cross-examination, Child 3 testified that she was unsure if anyone besides Husbands, Child 7, and herself were in the house. *See* R. at 754-55.

The record before H.O. included a statement from Child 3, admitted through Ennals during Husbands' criminal trial (pursuant to 11 *Del. C.* § 3507). According to that statement, Child 3 felt weird when Husbands tried to get under her blanket, and she tried to hold onto the blanket.[65] Husbands started touching Child 3's arm and rubbing on her underwear. Then, with his hand, Husbands touched her close to the front and back of her pubic area. As Husbands made his advances, Child 3 held her legs together and scooched away. When Child 7 woke up, the girls went into Child 7's room.

Mother 3[66]

When Mother 3 was eighteen or nineteen, she, Mother 7, and Husbands worked together at a restaurant but they lost touch until their daughters became friends in fourth grade.[67] Mother 3 said that she saw Mother 7 only when Mother 7 dropped Child 7 off at Mother 3's house and she never "hung out" with Mother 7 or Husbands.[68] According to Mother 3, most of her interaction with Mother 7 was through phone calls and texts and was "all about the kids."[69] She no longer speaks to Mother 7.

---

[65] *See* R. at 541-56. Because of Husbands' arguments on appeal, it is important to note that, pursuant to D.R.E. 801(d)(1)(C), a statement admitted pursuant to 11 *Del. C.* § 3507 is not hearsay. *Infra* p. 74.

[66] R. at 987-1014 (Hr'g Tr. at 152-79).

[67] Mother 2 and Mother 7 worked at two restaurants together but it is unclear whether Husbands worked at both or just one of the restaurants. *See* R. at 988-89.

[68] R. at 1006 (Hr'g Tr. at 171).

[69] R. at 1007.

23

Mother 3 learned Mother 7 and Husbands were having marital problems when Mother 7 dropped off Child 7 at Mother 3's house. According to Mother 3, Mother 7 said she caught Husbands inappropriately interacting with young women online.[70] Mother 3 replied that she thought that was horrible. A few months after this, Mother 7 called Mother 3. Mother 7 sounded very distraught and said she had to tell Mother 3 something but did not know how to tell her.[71] This scared Mother 3. Mother 7 told her that Husbands touched Child 3 but did not provide any details. Upon hearing this, Mother 3 became extremely upset and started crying. Mother 7 told Mother 3 she had already called the Division of Family Services.[72] After this phone call, Mother 3 left work crying and very upset, picked up Child 3, and took her to Delaware State Police Troop 7. When she arrived at Troop 7, Mother 3 asked to speak in the back because she did not want to discuss such a "delicate matter" through a glass window.[73] Mother 3 told the police that Husbands touched Child 3.

When the police at Troop 7 spoke to Child 3, she would not tell them what happened. Mother 3 believes Child 3 did not want to talk about it because the officer was a man. The police took Mother 3's statement about what Mother 7 told her. After taking Mother 3's statement, the police told Mother 3 to go to Troop 4 but that

---

[70] R. at 1008-09.
[71] R. at 990.
[72] Mother 3 later learned this was not true.
[73] R. at 992 (Hr'g Tr. at 157).

Child 3 did not need to go, and the CAC would contact her. Mother 3 dropped off Child 3 and went to Troop 4. In speaking to the police at Troop 4, she learned that Mother 7 had not called the police or Division of Family Services.

Mother 3 took Child 3 for a CAC interview. Mother 3 was not allowed in the room during Child 3's interview. After the interview, Mother 3 was told that Child 3 "clammed up and did not say anything."[74] Because Child 3 would not talk to the CAC interviewer, an interview was scheduled with Carla Ennals. Mother 3 testified that during the Ennals' interview, Child 3 finally opened up. Ennals was the only person Child 3 talked to about the incident. Prior to Husbands' criminal trial, Child 3 would not talk to Mother 3 about what happened.[75] Mother 3 believes that Child 3 did not want to talk because she was embarrassed. According to Mother 3, the incident created tension in their home and affected Child 3's behavior.

According to Mother 3, Mother 7 never asked her to have Child 3 make up accusations or say that she was touched. Mother 3 believes Child 3 told the truth to Ennals and at Husbands' criminal trial. Child 3 never recanted. Mother 3 further testified that it was extremely hard for Child 3 to testify at Husbands' criminal trial

---

[74] R. at 994 (Hr'g Tr. at 159).

[75] However, Child 3 did tell Mother 3 that Child 7 said Husbands touched other girls and Child 7. R. at 999-1001 (Hr'g Tr. at 164-66). In response, Mother 3 gave the police names of the potential victims she learned from Child 3. *Id.* at 1001. At some point, Mother 3 asked Mother 7 if Husbands had touched other girls. Mother 7 told her there were other girls and that Child 7 said Husbands had touched her. The Record does not indicate when Mother 3 asked Mother 7 about Husbands touching other girls, when Child 3 and Mother 3 spoke about Child 3's conversation with Child 7, or when Mother 3 provided names of the potential victims to the police.

25

and she was attending counseling at a center for sexually abused children. It was only after the trial that Child 3 was able to discuss the incident with Mother 3. Child 3 told Mother 3 that during the sleepover she and Child 7 pushed two air mattresses together in the living room and that Husbands "touched her in her private[s] and in her butt."[76] Child 3 said it was horrible, and when Husbands touched her, she squeezed her legs closed to prevent him from touching her and was "squirming away at the same time."[77]

Child 4[78]

At the time of the alleged offenses, Child 4 was thirteen years old and in the seventh grade. Child 4's family was friends with Husbands and his family. Child 4 went to Husbands' house numerous times and spent the night. According to Child 4, the families usually got together for baseball.

In June 2014, Child 4 and her family went to Husbands house.[79] While everyone mingled in the kitchen and living room area, Child 4 fell asleep on the couch while watching TV and did not wake up until later in the evening. When Child 4 woke up, there was a hand lying on top of her clothing over her stomach, which made her uncomfortable. When she looked to see whose hand it was, she saw

---

[76] R. at 1013 (Hr'g Tr. at 178).
[77] *Id.*
[78] R. at 576-94.
[79] Child 4 testified that her family did not intend to spend the night. R. at 103.

26

Husbands lying on an air mattress next to the couch with his hand resting on her stomach. Because the room was dark, Child 4 was unable to see if anyone else was in the room. At first, Child 4 thought Husbands was asleep, but she realized he was awake when she moved to get off the couch. When she moved, Husbands opened his eyes, looked at her, and his hand twitched. Child 4 got off the couch by going over the armrest because Husbands did not leave any room for her to get off the couch any other way. Once off the couch, Child 4 went to Child 7's room for the rest of the night.

Child 4 did not speak about the June 2014 incident until a year later. In June 2015, Mother 4 asked Child 4 some questions after learning that other young girls accused Husbands of inappropriate touching. Prior to learning about the other girls' accusations, Child 4 thought Husbands did not mean for his hand to be on her stomach. But after hearing the accusations, Child 4 realized it was not an accident. Child 4 went for an interview with the CAC in June 2015. At Husbands' criminal trial in November 2016, Child 4 testified that she felt Husbands did something wrong because an adult should not touch a thirteen-year-old.

Mother 4[80]

Mother 4 met Husbands and his family five or six years ago, when her son and Husbands' son became friends while playing travel baseball. The two families became good friends and used to get together at Husbands' house. Sometimes Mother 4 and Mother 7 socialized without their husbands. At the time of the Hearing, Mother 4 and Mother 7 were not close, but their sons were still close. Mother 4 interacts with Mother 7 but they are no longer friends. In Mother 4's opinion, Husbands should not be an educator and the thought of it is "disgusting."

When the accusations against Husbands' "came out," Mother 7 called Mother 4 at work and told Mother 4 that according to Child 7, none of Child 7's friends would come over because Husbands touches them.[81] Mother 4 advised Mother 7 that she needed to "contact the police and the 800 number hotline" because Mother 4 knew about mandatory reporting.[82] Mother 4 also told Mother 7 that if she did not make the call before four o'clock Mother 4 had to make the call.

About two days later, Mother 7 dropped her son off at Mother 4's house for baseball practice. Later that night, Child 4 asked Mother 4 what was going on because she saw that Mother 7 was upset when she dropped off her son.[83] When

---

[80] R. at 1016-39 (Hr'g Tr. at 181-204).
[81] R. at 1018. Mother 4 testified that she is "not good with dates," but believes Mother 7 called her during the summertime. R. at 1027 (Hr'g Tr. at 192); *see also* R. at 1993 (H.O. Decision).
[82] R. at 1019. Mother 4 is employed by the Division of Family Services for the State of Delaware.
[83] R. at 1027-28.

Mother 4 told Child 4 about what Child 7 had said to Mother 7, Mother 4 knew something was wrong because of the look on Child 4's face. Mother 4 tried to reassure Child 4 saying, "no, honey. You never spent the night at their house ever. You don't have anything to worry about. You were never with him alone."[84] But Child 4 replied that Mother 4 had left her there once when she fell asleep on the couch, and on that night, Child 4 woke up to find Husbands lying next to her with his hand on her. Child 4 told Mother 4 that Husbands' hand was on her leg and under the covers.[85] When Mother 4 heard this, she "just kept telling her, no, no. You never stayed there."[86] Child 4 said she climbed off the couch, went into Child 7's room, and "got underneath her covers very tight and covered my head."[87] Mother 4 asked if Husbands followed her and Child 4 said he did not. Child 4 told Mother 4 that she never said anything because she thought it was an accident.[88] The next day, Mother 4 scheduled a CAC interview for Child 4 and took Child 4 to the police to be interviewed. The detectives briefly spoke to Mother 4 after Child 4's interviews.

---

[84] R. at 1019-20 (Hr'g Tr. at 184-85).
[85] During Husbands' criminal trial, Child 4 testified that Husbands touched her stomach, not her leg. R. at 1025-26.
[86] R. at 1020.
[87] *Id.*
[88] Mother 4 thinks that Child 4 "always knew it wasn't an accident" but she just never told anyone. R. at 1021 (Hr'g Tr. at. 186).

At the Hearing, Husband's counsel read a portion of Child 4's criminal trial testimony into the record before the H.O. and questioned Mother 4 about it. The portion that defense counsel read included Child 4's testimony that she initially believed that Husbands touched her accidentally, but after Mother 4 told her about the other girls making accusations, she believed it was not an accident.[89] Husbands' counsel asked Mother 4 if she ever told Child 4 that what Husbands did was wrong. In response, Mother 4 reasserted her initial testimony that the opposite happened: that Mother 4 kept saying "no" and Child 4 is the one who kept saying it happened. Mother 4 explained that she kept rejecting the idea that she left Child 4 alone at Husbands' house until she "finally got [herself] together," and asked Child 4 to explain what happened. To this day, however, Mother 4 does not remember leaving Child 4 alone at Husbands' house.

Mother 4 said that testifying at Husbands' criminal trial was hard on Child 4, but she did not change her story or recant. According to Mother 4, Child 4 just did not want to talk about the incident at all and refused to go to counseling even though Mother 4 set up a session.

---

[89] R. at 1034-35.

<u>Child 5</u>[90]

Child 5, a 2006 graduate of Milford High School, was in Husbands' Government class at Milford High School.[91] Child 5 babysat Husbands' children for about a year. She testified that while she enjoyed babysitting Husbands' children, she had some uncomfortable interactions with Husbands.[92] Child 5's most uncomfortable interaction with Husbands was in December 2006 shortly after she turned eighteen. Child 5 was home on break during her freshman year of college and babysat for Husbands' children some time between Christmas and New Year's when Husbands and Mother 7 went out. Child 5 could not remember the specifics, but testified that throughout the night Husbands repeatedly texted her and the texts were "more than, 'how are the kids.'" The texting got to a point where Child 5 responded, "you should be enjoying your wife right now" or made some sort of comment like that.[93]

When Husbands came home at the end of the night, he asked Child 5 if she wanted to play darts and see his "man cave area," in the basement.[94] Child 5 initially said "no," but when Husbands kept asking, she gave in and went into the basement

---

[90] R. at 939-54 (Hr'g Tr. at 104-19).
[91] Child 5 testified that she thought it was Government but was not be sure because it was a long time ago. *See* R. at 940 (Hr'g Tr. at 105). Prior to becoming an administrator, Husbands was a teacher at Milford High School. *See infra* p. 54.
[92] R. at 941 (Hr'g Tr. at 106).
[93] R. at 942 (Hr'g Tr. at 107).
[94] R. at 942.

with Husbands. Child 5 explained that she wanted to say "no" but she "always looked at [Husbands] as a figure of authority and really did not feel like [she] could say no . . . ."[95] Child 5 was uncomfortable being in the basement because Mother 7 was upstairs and Child 5 did understand why she was in the basement. Eventually, Mother 7 "came down and stood behind us for a minute while we played."[96] When they finished their first game, Child 5 told Husbands she had to go home. Husbands walked Child 5 to her car and asked if she wanted to see his new camper. When Husbands started to go into the camper, Child 5 asked, "[a]re you going to turn the lights on?" Husbands replied that the lights did not work.[97] After Child 5 left, Husbands texted her saying, "that was the most fun he had had in a long time."[98]

After Child 5 returned to college, Husbands continued to text her "[s]ometimes about his children" and "[s]ometimes about [her] life and whatever," which Child 5 felt was "just inappropriate."[99] Husbands texted Child 5 that he was considering buying a house in Utah and asked her to go skiing with him there. Child 5 testified that Husbands' texts were "inappropriate in the sense of sexual conversation" and that she never initiated the text messages and gave only simple responses.[100] According to Child 5, she only responded because she considers it

---

[95] *Id.*
[96] R. at 942-43 (Hr'g Tr. at 107-08).
[97] R. at 943 (Hr'g Tr. at 108).
[98] R. at 948 (Hr'g Tr. at 113).
[99] *Id.* at 948-49.
[100] R. at 950 (Hr'g Tr. at 115).

32

disrespectful not to respond to an authority figure.[101] Husbands did not stop texting Child 5 until she told him that if he did not stop she would seek a restraining order.

Child 7[102]

[REDACTED]          She testified at the Hearing that Husbands did not tell her what to say at the Hearing.[103] During Child 7's testimony, Husbands' counsel introduced into evidence the transcript from the second day of Husbands' criminal trial (which included Child 7's sworn testimony).[104]

During her Hearing testimony, Child 7 read a portion of her sworn testimony from Husbands' criminal trial. That testimony is as follows.    [REDACTED]

, she and Child 2 were never friends, she and Child 3 were friends but is unsure if they still are because Child 3 has been rude to her recently, and she and Child 4 are friends. All four children have slept over at Child 7's house and, during those sleepovers, the girls usually slept on air mattresses in the living room. Husbands never laid on the air mattresses with the girls. Mother 7 and Mother 1 told her what to say for her CAC interviews and Mother 7 told her untrue things, like,

---

[101] R. at 950.

[102] R. at 1247-56 (Hr'g Tr. at 352-61).

[103] R. at 1252-53 (Hr'g Tr. at 357-58). On direct-examination, Husbands' counsel asked, "[a]nd as you sit here today, has [Husbands] ever instructed you or told what to say for any hearing or any statement you have given." Child 7 replied, "No." *Id.* at 1253.

[104] *See* R. at 1264-65 (Hr'g Tr. at 369-70) (also included testimony from Mother 7).

"[r]emember, [Husbands] slept with this girl and this girl and this girl."[105] While on a walk, Mother 1 told Child 7 to say what Mother 7 told her to say.

The following is a recitation of the remainder of Child 7's testimony at Husbands' criminal trial that Child 7 did not read into the record at the Hearing (but was in the record before the H.O.).

Mother 7 forced Child 7 to be interviewed by the CAC in June 2015 but she never told anyone that Mother 7 forced her to be interviewed. Mother 7 and Mother 1 told her what to say "in the summer before the . . . first interview."[106] According to Child 7, "when [she and Mother 7] got to the interview," Mother 7 told her "[r]emember, [Husbands] slept with this girl and this girl and this girl . . . touched these girls," and told her where Husbands' touched the alleged victims.[107] After this conversation, Mother 1 took Child 7 on a walk, asked about what Mother 7 told Child 7, and then told Child 7 to "[m]ake sure to say that in your interview, and stuff."[108] Child 7 met with, but refused to speak to, the prosecution the Friday before Husbands' November 2015 criminal trial. Child 7 spent the weekend leading up to

---

[105] R. at 1254 (Hr'g Tr. at 359).
[106] R. at 1705-06. Child 7 testified that she knew the impact of not telling the CAC that Mother 7 and Mother 1 told her to lie about Husbands touching other children, including the CAC interviewing Children 1-3 about Husbands' touching them and subsequently testifying about being touched. *See* R. at 1706-08.
[107] R. at 1705-06, 11.
[108] R. at 1706.

the criminal trial with Husbands.[109] The following Tuesday was the first time Child 7 told anyone that Mother 7 and Mother 1 coached her.[110] At the criminal trial, Child 7 testified that she did <u>not</u> tell the CAC interviewer that Husbands laid on the air mattress with her friends, that she was never friends with Child 2, but that when they were in the same class, Child 2 slept over at Husbands' house, and that she did not remember marking an anatomical drawing.[111]

Barbara Shalley-Leonard[112]

From 1986 to 2009, Barbara Shalley-Leonard was employed by MSD as a Spanish teacher and then a guidance counselor. For a time, she taught with Husbands at Milford High School. In 2007, when Shalley-Leonard was a guidance counselor at Milford High School, Amanda Parisi, an English as a Second Language ("ESL") teacher came to her "with some concerns" based on something one of her students ("Child 6") told her about Husbands.[113] Parisi told Shalley-Leonard that Child 6 said Husbands was handing her notes saying she was pretty and attractive, asking Child 6 if she found Husbands attractive, and asking whether Child 6 wanted

---

[109] During cross-examination, when asked, "[y]ou don't want to see anything bad happen to your dad, do you, [Child 7]?," Child 7 became upset and the Court had to take a short recess to give Child 7 time to calm down. *See* R. at 1703-04.

[110] On re-direct examination, Child 7 testified that she told her grandmother that Mother 1 and Mother 7 were telling her what to say to the CAC. R. at 1719.

[111] On re-direct-examination, Child 7 testified that she told the prosecutors a month before the trial that Husbands' did not sleep on the air mattress with the alleged victims. R. at 1718.

[112] R. at 861-93 (Hr'g Tr. at 26-58).

[113] At the time, Child 6 was a ninth or tenth grade ESL student and Husbands was her Social Studies teacher. R. at 862 (Hr'g Tr. at 27).

35

to stay after school for extra help. Shalley-Leonard asked Parisi to "write down as soon as she could for memory purposes" everything she and Child 6 talked about regarding Husbands.[114] Parisi complied and gave her notes to Shalley-Leonard. According to Shalley-Leonard, Parisi's notes from her conversation with Child 6 were "absolutely" similar to Shalley-Leonard's conversation with Child 6.[115]

After Parisi reported Child 6's conversation, Shalley-Leonard called Child 6 to her office to talk about Husbands' notes. Child 6 came to Shalley-Leonard's office with another student, who Child 6 had told about the notes.[116] Child 6 told Shalley-Leonard that Husbands was passing her notes and putting them down as he was returning homework on her desk.[117] Child 6 showed Shalley-Leonard the notes from Husbands.[118] When Shalley-Leonard asked Child 6 how the notes made her feel, Child 6 said that they made her confused as to why she had to stay after school with Husbands, and afraid that if she did not, she would be in trouble. Shalley-Leonard testified that Child 6 did not ask for or need extra help because she had a B in Husbands' class. On direct examination, Shalley-Leonard testified that she "had no doubt" the notes were in Husbands' handwriting and that the sentence, "we have

---

[114] R. at 865 (Hr'g Tr. at 30). Parisi's notes on her conversation with Child 6 were marked as Exhibit R-1 and entered into the record before the H.O. *See* R. at 1431 (DOE Ex. 1).
[115] R. at 865 (Hr'g Tr. at 30).
[116] R. at 864 (Hr'g Tr. at 29).
[117] R. at 864-65 (Hr'g Tr. at 29-30).
[118] R. at 865-68 (Hr'g Tr. at 30-33). These notes were marked as Exhibits R2, R3, and R4 and entered in the record before the H.O. *See* R. at 869-71 (Hr'g Tr. at 34-36 (DOE Exhibits 2-4)).

to keep this a secret" in one of the notes asking Child 6 to stay after school, was "a red, big red flag."[119] Shalley-Leonard then elaborated on why this was such a "red flag":

> Asking [Child 6] if she would be able to stay after school. Outside of the building, [Husbands] had a key to a trailer there. We have modulars for classrooms.... [A] teacher should never have a child in a classroom by themselves without the door open and in full sight. That's just a given. But this is asking her to go to a trailer outside of school. They can meet in a trailer.[120]

Based on this information, Shalley-Leonard became concerned that Husbands was going to have inappropriate sexual contact with Child 6.[121] Following her interview with Child 6, Shalley-Leonard went to her principal, Dr. Phyllis Kohel, gave Dr. Kohel Husbands' notes and Parisi's written statement, and told Dr. Kohel that Child 6 had to be taken out of Husbands' classroom.[122]

Dr. Kohel, with Shalley-Leonard present to interpret and translate, interviewed Child 6. Dr. Kohel questioned Child 6 about each note. Child 6 said she told her parents about the notes and they told her not to cause any trouble. Child

---

[119] R. at 861 (Hr'g Tr. at 26); *see also* R. at 867 (Hr'g Tr. at 32). On cross-examination, Shalley-Leonard testified she was "pretty sure" it was Husbands' handwriting. *Id.* at 888 (Hr'g Tr. at 53).
[120] R. at 867-68 (Hr'g Tr. at 32-33).
[121] *See* R. at 876 (Hr'g Tr. at 41). Shalley-Leonard testified: "the whole thing was inappropriate. Keeping secrets, stay after school . . . in the trailer . . . a key that he should not have to a trailer." *Id.* at 876-77 (Hr'g Tr. at 41-42). According to Shalley-Leonard, only the principal and the teachers who taught in the trailers were allowed to have a key and Husbands did not teach in a trailer. *Id.* at 876-77.
[122] R. at 874 (Hr'g Tr. at 37).

6's parents did not want the police called, which Shalley-Leonard assumed was because "they most likely were undocumented."[123] Following the interview, Dr. Kohel, again with Shalley-Leonard present, interviewed two other girls who Child 6 said she had spoken to about the notes. Following these interviews, Dr. Kohel took Child 6 out of Husbands' class and called Husbands in to meet with her and the Personnel Director, Dr. Walmsley.

The incident with Child 6 prompted to Shalley-Leonard to contact Child 5[124] because Child 5 (a former student of Husbands) used to babysit Husbands' children when she was in high school.[125] Shalley-Leonard wanted to know if Child 5 had experienced "anything inappropriate in all of the time that she had been baby-sitting for [Husbands]."[126]

Dr. Phyllis Kohel[127]

Dr. Kohel was employed by the MSD in various capacities from 1984 through 2016.[128] Dr. Kohel was the Principal of Milford High School when Husbands was a teacher there. Dr. Kohel recalled the 2007 incident involving Child 6 and

---

[123] R. at 875 (Hr'g Tr. at 40).
[124] *Supra* pp. 31-33.
[125] R. at 878-80 (Hr'g Tr. at 43-45).
[126] R. at 880.
[127] R. at 895-939 (Hr'g Tr. at 60-104).
[128] During this period, the only time Dr. Kohel was not employed by the MSD was the 2011-2012 school year when she was the Superintendent of the Woodbridge School District.

38

Husbands.[129] According to Dr. Kohel, Shalley-Leonard came to talk to her because, given the notes and her interview of Child 6, Shalley-Leonard was concerned for Child 6's safety. Shalley-Leonard relayed to Dr. Kohel that as Husbands passed out papers in the classroom, he would leave notes on Child 6's desk asking her if she needed tutoring. Over time, the notes became a little more personal. One of the more personal notes told Child 6 that Husbands thought she was pretty and asked if Child 6 thought he was handsome or pretty as well. Dr. Kohel and Shalley-Leonard arranged an interview with Child 6 because Dr. Kohel wanted to "ask her exactly what was going on."[130] Present at the interview were Dr. Kohel, Shalley-Leonard, and the Assistant Principal, Dr. McDaniel.[131] Dr. Kohel took notes during this interview with Child 6.[132] When Dr. Kohel asked Child 6 if she had talked to anyone other than Shalley-Leonard about the notes, Child 6 said she had discussed the notes with her sister, a cousin, an aunt, and another student.

Following the interview, Dr. Kohel tried to verify what Child 6 had told her by comparing the handwriting on Ex. R-3[133] to homework from some of Husbands' other students. According to Dr. Kohel, "[t]here was no definite documentation

---

[129] Dr. Kohel testified that the incident occurred in the Spring of 2007. R. at 897 (Hr'g Tr. at 62).
[130] R. at 898 (Hr'g Tr. at 63).
[131] *Id.*
[132] Dr. Kohel's notes were marked as Ex. R-5 and admitted into the record before the H.O. R. at 1977; *see also* R. at 1435 (DOE Ex. 5.1-5.2)
[133] R. at 1433 (DOE Ex. 3).

39

showing that the handwriting was the same handwriting."[134] She also met with the Personnel Director and discussed all the information Dr. Kohel had gathered.[135] She and the Personnel Director concluded that "with the information that we had, we could not prove guilt or innocence,"[136] but the Personnel Director told Husbands:

> [I]f the information got out, there would be a perception that he was doing something inappropriate. So, he needed to be careful and simply make sure that there were boundaries between his relationship with someone as a student . . . .[137]

Dr. Kohel testified that Child 6's family did not want the police or the Resource Officer involved in the matter. Dr. Kohel surmised that the family was perhaps here illegally and feared police involvement might result in their deportation.[138]

Dr. Kohel testified about a second incident involving Husbands. This incident came to her attention when Shalley-Leonard showed Dr. Kohel a phone record provided by Child 5.[139] The phone record showed that Husbands and Child 5 exchanged forty-five text messages in a sixty-eight day period, and the majority of the texts originated from Husband's cell phone number.[140] Shalley-Leonard brought

---

[134] R. at 901 (Hr'g Tr. at 66).
[135] *See* R. at 897-901 (Hr'g Tr. at 62-66).
[136] *Id.*
[137] *Id.* at 901-02 (Hr'g Tr. at 66-67).
[138] R. at 902 (Hr'g Tr. at 67).
[139] Child 5 and Shalley-Leonard were friends. R. at 904.
[140] Child 5's phone record was marked as Ex. R8 and entered into the record before the H.O. over Husbands' counsel's relevance objection. *See* R. at 1439-55 (DOE Ex. 8.1-8.17). Husbands' counsel also objected to Dr. Kohel's testimony on this topic. *See* R. at 902-05, 909, 929-30 (Hr'g Tr. at 67-70, 74, 94-95).

this information to Dr. Kohel's attention because Child 5 "wanted this to stop."[141] Dr. Kohel's understanding, based on her conversation with Shalley-Leonard, was that Child 5's parents did not approve of the fact that Child 5 "was being texted or called so many times from a prior teacher."[142]

Upon learning this information, Dr. Kohel had a conversation with Husbands. She told Husbands that Child 5's father was upset that there was so much contact with Child 5 and that it appeared to be inappropriate. Dr. Kohel also told Husbands that his almost daily texting to Child 5 made Child 5 uncomfortable. In response, Husbands told Dr. Kohel that most of his texts were to say he hoped everything was going well for Child 5 in college and to talk about his children. Dr. Kohel did not take any disciplinary action against Husbands because Child 5 was no longer a student in the school.[143]

In 2015, while serving as the MSD Superintendent, Dr. Kohel became aware of additional incidents involving Husbands, who was then an Assistant Principal at Milford High School. Dr. Kohel testified that while at a conference in late Spring or June of 2015, a police officer contacted her and asked if Husbands was also at the conference. Husbands was at the conference. The police officer told her that charges

---

[141] *See id.* at 905-07 (Hr'g Tr. at 70-72).
[142] *Id.* at 907 (Hr'g Tr. at 72).
[143] R. at 909 (Hr'g Tr. at 74).

were being brought against Husbands for inappropriate conduct with some young female students, and that Husbands needed to be asked to leave the school. Dr. Kohel and Dr. Walmsley called Husbands out of the conference to speak to him. As soon as they did that, Husbands said he had a feeling he knew what it was about and told them Mother 7 was making unfounded charges against him. Dr. Kohel explained to Husbands that he needed to go back to school, retrieve his personal belongings from his office, and was suspended with pay pending further investigation of the accusations because of the nature of the charges and the fact he could not be around young children.

Dr. Kohel was officially notified of the charges of inappropriate sexual contact with students under the age of thirteen against Husbands by the letter the DELJIS Executive Director emailed to Dr. Walmsley.[144] According to Dr. Kohel, a teacher or principal charged with crimes involving children is immediately suspended, and once the educator is arrested, they normally are terminated.[145] The teacher or principal cannot be in school while charges are pending.[146] Dr. Kohel said that once the charges were official, upon the advice of counsel, Husbands was suspended without pay. Dr. Kohel testified that Dr. Walmsley spoke with DOE personnel and

---

[144] R. at 912-13 (Hr'g Tr. at 77-78); *see also* R. at 1456 (DOE Ex. 14.1). As previously noted, the criminal Complaint, Warrant, and Affidavit of Probable Cause were attached to the letter. *See infra* p. 2 and note 2.
[145] *Id.*
[146] *Id.*

42

was told that Husbands' license was suspended and MSD had grounds to terminate him. Dr. Kohel testified that Husbands' contract was up for renewal/non-renewal in December 2015 and "because [Husbands] was an administrator, the [Milford School] Board has the right to non-renew, if they wish. So whether Mr. Husbands was guilty or not of these accusations, our Board chose not to renew his contract after that school year."[147] According to Dr. Kohel, the pending charges were the only reason Husbands' contract was not renewed.[148] Dr. Kohel knew that given the charges, Husbands could not have any contact with young children. According to Dr. Kohel, there was "no way" that she could allow a teacher or principal to work in the school district who was facing charges of sexual offenses against young children, had a suspended license, and was not allowed to be with children under eighteen.

Dr. Paul Walmsley[149]

Dr. Walmsley was the MSD Director of Personnel for approximately six years.[150] Dr. Walmsley knows Husbands because they both worked for MSD. Husbands was hired as a teacher in July 2001, and in July 2012 Husbands became an Assistant Principal at Milford High School.

---

[147] *Id.* at 927-28 (Hr'g Tr. at 92-93). In December of each year, the MSD Board of Education makes contract renewal decisions.
[148] *Id.* at 916 (Hr'g Tr. at 81).
[149] R. at 1110-31 (Hr'g Tr. at 275-96).
[150] Dr. Walmsley left Milford School District in July 2017 and currently works at the Odyssey Charter School. R. at 1110 (Hr'g Tr. at 275).

Dr. Walmsley first learned about Husbands' criminal charges on June 25, 2015. On that day, the police notified MSD Superintendent Dr. Kohel, and she notified Dr. Walmsley. On June 27, 2015, Dr. Walmsley received the DELJIS report setting forth the criminal charges against Husbands.[151] On June 29, 2015, Dr. Walmsley sent Husbands a "Notice of Suspension Without Pay," informing Husbands that he was suspended without pay effective June 25, 2015. Dr. Walmsley testified that the suspension was based solely on the pending criminal charges.

Dr. Walmsley then testified about Husbands' employment contract. Dr. Walmsley testified that administrator contracts are different than teacher contracts. The difference is that administrators sign their contracts and the MSD Board of Education is required to give six-month's notice for non-renewal of an administrator's contract. According to Dr. Walmsley, the MSD Board of Education starts discussing every administrator's contract (not just those up for renewal) every November and votes on renewal/non-renewal every December. Husbands' contract was set to expire on June 30, 2016, during the period of his suspension, which meant notice of non-renewal needed to be given in December 2015. During this process in late 2015, Dr. Kohel and Dr. Walmsley provided information about Husbands' DELJIS report to the MSD Board of Education. During an Executive Session, the MSD Board of Education decided not to renew Husbands' contract. On December

---

[151] R. at 1112-13 (Hr'g Tr. at 277-78).

22, 2015, Dr. Walmsley sent Husbands a "Notice of Non-Renewal," which did not include a reason for non-renewal.[152] Dr. Walmsley testified that he was not part of the decision-making process, did not observe or hear the Executive Session, and could not speak for the MSD Board of Education, but he believed the non-renewal was based on the pending charges because it was not performance-based and there were no budget cuts. Dr. Walmsley further testified that the DOE had suspended Husbands' license and he was unable to work at that time.

Charles Simpson[153]

Charles Simpson is a DOE investigator who works for Associate Secretary Angeline Rivello. Simpson testified that the DOE investigation began in 2015 and someone else conducted the initial steps of the investigation because he did not begin working for the DOE until May 2016. After Husbands' criminal trial, Simpson became the investigator and conducted all of the interviews.

The DOE was notified of the criminal charges against Husbands by a newspaper article and by the MSD. According to Simpson, pursuant to Delaware law, Husbands' license was automatically suspended, effective the day of his arrest.

---

[152] Dr. Walmsley testified that administrative contracts include a clause for termination. R. at 1125 (Hr'g Tr. at 290). The termination clause requires a hearing before the MSD Board of Education and the School District must prove just cause. *Id.* at 1126. Dr. Walmsley testified that this did not occur because Husbands was not terminated, rather, his contract was not renewed. *Id.*
[153] R. at 1132-65 (Hr'g Tr. at 297-330).

An automatic suspension lasts until the criminal case is adjudicated and acquittal on criminal charges does not preclude a separate DOE investigation.

Simpson testified that the DOE conducted a separate investigation to determine if any disciplinary or license actions were warranted. The investigation included reviewing the criminal trial testimony, interviews with the detectives and adult witnesses, witness statements, and statements from the mothers of the alleged victims.[154] Simpson testified that when he interviewed Dr. Walmsley and Dr. Kohel, they indicated that the decision not to renew Husbands' contract was based solely on the sex offense charges. After a full investigation, including interviews of MSD officials and other witnesses, Simpson reviewed his investigative findings in consultation with Associate Secretary Rivello. They then submitted a recommendation to Secretary of Education Bunting. Based on the investigation and recommendation, Secretary Bunting signed a Notice of Revocation to revoke Husbands' license.

---

[154] R. at 1142 (Hr'g Tr. at 307).

Detective Robert Truitt[155]

Detective Truitt, a Detective in the Delaware State Police Major Crimes Unit, testified that he has investigated numerous cases involving sexual abuse of children[156] and was involved in Husbands' criminal investigation. According to Det. Truitt, on June 23, 2015, Mother 3 and Mother 7 accused Husbands of inappropriately touching children and Detective Doughty filed the initial report after interviewing Mother 3 and Mother 7. The next day, after talking to Det. Doughty, Det. Truitt picked up the investigation and started scheduling CAC forensic interviews for the children involved in the investigation.[157]

According to Det. Truitt, the forensic interviewers at the CAC are trained to interview and deal with children. The CAC interview is one-on-one and the interviewer purposefully asks open-ended questions to allow the child to talk. While a forensic interviewer conducts CAC interviews, a team comprised of police officers, DOJ and Division of Family Services personnel, observes on a monitor in a separate room. During a break, the forensic interviewer meets with the team to determine if there are additional questions that need to be asked or subjects that need to be further explored.

---

[155] R. at 1067-1110, 1341-61 (Hr'g Tr. at 232-75, 446-66).
[156] Det. Truitt has served twenty-one years with the Delaware State Police, the last ten as a detective. R. at 1067 (Hr'g Tr. at 232). During the investigation, Det. Truitt was stationed at Troop 4 in Georgetown. *Id.* at 1068 (Hr'g Tr. at 233).
[157] *See* R. at 1069-70 (Hr'g Tr. at 234-35).

47

Det. Truitt testified that Mother 7 reported the initial accusations to the police after a conversation with Child 7. During that conversation, Child 7 asked if she could sleep over at a friend's house. When Mother 7 asked if the friend could sleep over at their house instead, Child 7 told her no one wanted to sleepover because daddy touches them. When Mother 7 asked Child 7 to clarify what she meant, Child 7 said that Child 2 and Child 3 told her that daddy touched them.[158] Mother 7 told Mother 3 about this conversation.[159] After telling Mother 3, Mother 7 and Mother 3 reported the accusations to the police and were interviewed by Det. Doughty.

Det. Truitt testified that on June 24, 2015, the CAC interviewed Child 7, Child 2, and Child 3. Child 1 was interviewed at a later date and Child 7 had a second CAC interview, which was consistent with her first interview.[160] Det. Truitt was a member of the team conducting the CAC interviews and watched each interview on a monitor from a separate room.[161] Det. Truitt testified that Child 7 disclosed that Child 1 and Child 3 told her they had been touched by Husbands at sleepovers at her house. Child 7 did not disclose any type of inappropriate touching to the forensic interviewer who asked if it happened to Child 7. Child 7 disclosed that Child 1 was uncomfortable about spending the night at her house and told the interviewer the

---

[158] R. at 1073 (Hr'g Tr. at 238).

[159] It is unclear from the record why Mother 7 did not tell Mother 2 about the accusations.

[160] According to Det. Truitt, the CAC interviewed Child 7 a second time to see her reaction to what the other children told her, if she did anything else, or told anyone else. R. at 1351 (Hr'g Tr. at 456).

[161] R. at 1076-78 (Hr'g Tr. at 241-43).

48

name of another girl Husbands possibly touched. Child 7's CAC interview statements were similar to her conversation with Mother 7 and mirrored the statements of Child 1, Child 2, Child 3, and Child 4. Child 7 never said Mother 7 told the other girls what to say and Child 7 never recanted the statements she made during her CAC interviews.[162] Based on the CAC interviews, Det. Truitt believed there was enough evidence to prosecute Husbands.[163] The decision to prosecute was a collaborative decision with Deputy Attorney General Susan Purcell.[164] Det. Truitt testified he never had a reason to doubt the truthfulness of the children's statements.[165] He believes the children gave truthful statements to the CAC and were not coached because they were alone when interviewed by a stranger, there "was no hesitation in the story whatsoever," and there was no time to create a story or try to remember something they were coached on because there were too many details.[166]

Det. Truitt testified that he was involved in Husbands' criminal trial and sat through the entire trial. According to Det. Truitt, Child 1, Child 2, Child 3, and Child 4's CAC interview statements were consistent with their testimony at Husbands' criminal trial and they did not recant what they said in their CAC interviews. Det.

---

[162] R. at 1075, 1082-83, 1089-90 (Hr'g Tr. at 240, 247-48, 254-55).
[163] *See* DOE Ex. 14.1-14.7 (Complaint and Warrant and Affidavit of Probable Cause).
[164] R. at 1078-79 (Hr'g Tr. at 243-44).
[165] Det. Truitt testified that unlike the interviews of Child 1, Child 2, Child 3, Child 4, and Child 7, he has observed interviews where the child was not truthful. R. at 1081 (Hr'g Tr. at 246).
[166] R. at 1350-51 (Hr'g Tr. at 455-56). According to Det. Truitt, there were four different children saying they were inappropriately touched, and the inappropriate touching was similar. He did not see any coaching by the girls' parents or through any of the girls talking to each other.

49

Truitt said it was hard to watch the children testify and it was hard on the children to testify. The children "looked mortified" especially when the prosecution "had each child stand up in front of the jury box and in front of a courtroom full of people that they had never seen before in their life and they had to stand there and show the jurors where and how they were touched."[167] Det. Truitt testified that no one but Child 7 recanted and she did not do so until she took the stand to testify at Husbands' criminal trial. Det. Truitt noted that Child 7 "spent a day or the weekend with [Husbands] just prior to her testifying in court."[168] Det. Truitt testified that there was no evidence of a conspiracy or coaching by the mothers of the child victims. Det. Truitt then read excerpts of Child 1,[169] Child 3,[170] and Child 4's[171] sworn trial testimony from Husbands' criminal trial and testified that their CAC interviews were consistent with their trial testimony.

Det. Truitt testified that he spoke with Mother 7 on a couple of different occasions after her two children were interviewed by the CAC to confirm the facts. Mother 7 reiterated what Child 7 told her about her friends not wanting to spend the night.

---

[167] R. at 1084 (Hr'g Tr. at 249).
[168] *Id.*
[169] R. at 1092-93 (Hr'g Tr. at 257-58 (excerpt DOE Ex. 9 (B-129:1-21))); *see also supra* pp. 7-9 (summary of Child 1's trial testimony).
[170] R. at 1087-89 (Hr'g Tr. at 252-54 (excerpt DOE Ex. 9 (B-85:3-21))); *see also supra* pp. 22-23 (summary of Child 3's trial testimony).
[171] R. at 1090-1092 (Hr'g Tr. at 255-57 (excerpt DOE Ex. 9 (B105-106))); *see also supra* pp. 26-27 (summary of Child 4's trial testimony).

Det. Truitt testified about his interview with Husbands. Husbands told Det. Truitt that this was a witch-hunt, "that there was an effort by the parents and children" to accuse him of crimes because Mother 7 wanted custody of Child 7 and her brother after their divorce. Det. Truitt admitted that although it was not in his report, he did ask Mother 7 about Husbands' witch-hunt claim and she said she was not surprised Husbands would blame her. Det. Truitt testified that no one ever brought up issues of custody and Mother 7 only mentioned that her "marriage was failing" and was "headed for divorce."[172]

On re-direct, Det. Truitt read a portion of the narrative from Child 7's CAC interview:

> [The CAC interviewer] asked [Child 7] if she knew why she was there and [Child 7] replied by saying that other people are saying that her dad has touched them, but [Husbands] is saying that he didn't. [Child 7] stated that she didn't really know what was going on. [The interviewer] then asked [Child 7] to tell her what [Child 7] knew about [Husbands] touching them. [Child 7] stated that people come to her and ask to go in her room, they then tell her that [Husbands] has touched them. [Child 7] stated that [Child 3] and [Child 2] are the only ones that came to her and told her [that Husbands touched them]. . . . [Child 7] identified [Child 3] and [Child 2] as her friends. [Child 7] then stated that a couple more people told their mothers about being touched and [the interviewer] asked who they were. [Child 7] stated that this was [Child 1] and [another alleged victim]. [The interviewer] then asked [Child 7] to tell her how [Child 3] and [Child 2] told her about it. [Child 7] stated that [Child 2] came to her during the first month of 4th grade and [Child

---

[172] R. at 1095-96 (Hr'g Tr. at 260-61). On cross-examination, Det. Truitt testified that he did not interview all the parents of the children victims and did not ask them about Husbands' witch-hunt claim.

51

3] told her about it just a couple weeks ago, so they did not disclose to her at the same time.

[The interviewer] first asked [Child 7] to tell her everything that [Child 3] told her. [Child 7] stated that she and [Child 3] were playing and it was approximately 10:00 p.m. . . . so they got ready to go to sleep. [Child 7] stated that [Husbands] came in to check on them and [Child 3] asked him to lay down with them for awhile. [Child 7] stated that in the morning, [Child 3] asked [Child 7] to come into her bedroom. According to [Child 7], [Child 3] then told her that [Husbands] had touched her. According to [Child 7], [Husbands] had blown up [an air mattress] and there was some extra room, so [Child 3] invited [Husbands] to come and sleep with them because he was on the couch. [Child 7] stated that this was in the living room of [Husbands'] house. [Child 7] stated that she and [Child 3] were playing on their iPods and then went to sleep. According to [Child 7], [Husbands] has a neck condition and he can't lay on anything hard, so [Child 3] asked him to come lay on the air mattress with them. [Child 7] stated that [Husbands] then took a blanket off the couch, laid on the air mattress with them and slept. According to [Child 7], the sleeping configuration was that [Child 7] was on the left side, [Child 3] was in the middle and [Husbands] was on the right side. [Child 7] stated that in the morning, [Husbands] came out and checked on them and then laid back down on the bed. [Child 7] stated that [Child 3] wanted to go in [Child 7's] room because she's claustrophobic and [Husbands] was laying real close because he was about to fall off the edge. [Child 7] stated that she was sleeping on a single air mattress and [Child 3] slept on a double sized mattress. [Child 7] then stated that [Husbands] was on the mattress with [Child 3]. [Child 7] stated that when she and [Child 3] went to [Child 7's] room, [Child 3] told her that she got touched by [Husbands] so they stayed in her room for awhile. [Child 7] advised that [Child 3] told her that she got touched "down here," and [Child 7] pointed to her genital area. [Child 7] stated that [Husbands] was about to fall off the edge of the bed and believes that [Child 3] got touched by accident. [Child 7] felt as if [Husbands] probably touched her with his hand so he wouldn't fall off the edge of the bed. [Child 7] stated that she played on her iPhone and [Child 3] played on her iPod while they were in [Child 7's] room and [Husbands] made them breakfast. According to [Child 7], [Child 3] did not say anything else about getting touched. [Child 7] advised that she and [Child 3] then went out to eat breakfast.

52

[Child 7] stated that [Child 3] told her this the first time she spent the night which [Child 7] described as awhile ago maybe a month or three weeks ago. [Child 7] advised that [Child 2] told her about the incident during the first few days, weeks of the fourth grade. [The interviewer] asked [Child 7] if [Child 3] told her on a weekend and [Child 7] said she thought it was because they were still in school.

[The interviewer] then asked about [Child 2]. [Child 7] stated that [Child 2] spent the night with her in the third grade, but not in the fourth grade. [Child 7] stated that the beginning of fourth grade is when [Child 2] told [Child 7]. [Child 7] advised that [Child 2] told her that [Husbands] touched her when he was sleeping on the air mattress. [The interviewer] asked [Child 7] where she and [Child 2] were when this happened and [Child 7] stated that they were in the living room. According to [Child 7], she was on the double air mattress with [Child 2] and there was extra room so [Husbands] laid down with them on the mattress. According to [Child 7], [Child 2] told her that her dad had touched her a couple weeks after it happened. [Child 7] advised that she and [Child 2] were on the playground during recess when [Child 2] told her. According to [Child 7], [Child 2] told her that she was touched "down there" again where he touched [Child 3]. [Child 7] stated that she does not know how because she was asleep the whole time. [Child 7] then went into further detail about what [Child 2] told her. [Child 7] stated that [Husbands] was laying beside [Child 2] when he touched her down there, so she rolled over. [Child 2] then told [Child 7] that when [Husbands] was getting up, he put his hand down and touched [Child 2's] butt. [Child 7] then stated that [Child 3] told her that [Husbands] touched her with two fingers beside her private. According to [Child 7], she and [Child 2] were on the air mattress in the living room when this happened. [The interviewer] then presented [Child 7] with an anatomically correct female drawing (front and back). [Child 7] then documented with a marker two areas on the front and two areas on the back where both [Child 3] and [Child 2] disclosed that they were touched.

. . . .

[The interviewer] then asked [Child 7] how the talk went with [Mother 7]. [Child 7] stated that they were on a car ride and she told [Mother 7] that [Child 3] and [Child 2] both said that they had been touched down there. [Child 7] stated that [Child 1] moved to the couch after she got touched. [The interviewer] asked [Child 7] what happened to make

53

[Child 7] and [Mother 7] talk about it. [Child 7] stated that [Mother 7] was worried because no one wanted to spend the night at [Husbands'] house anymore. [Child 7] informed [Mother 7] that it made [Child 3] and [Child 2] feel uncomfortable because [Husbands] sleeps with them. [Child 7] then told [Mother 7] that [Child 3] and [Child 2] told her that they had been touched.[173]

Det. Truitt testified about Husbands' DELJIS Charge Summary (Ex. R-13) noting that his conditions of bond included no contact with children under the age of 18 except upon good cause shown such as his own children, because he was charged with a crime involving child sexual abuse or exploitation.

Husbands[174]

Husbands testified at the Hearing that he worked for the MSD for seventeen years: fourteen years as a teacher and three years as an administrator. During his employment, Husbands and the MSD Board of Education signed numerous employment contracts. His most recent contract was signed on December 16, 2014 and expired on June 30, 2016.[175] According to Husbands, the contract contained a termination clause that limited termination to good and just cause and granted Husbands the right to a fair hearing before either the MSD Board of Education or a designated hearing officer. Husbands further testified that if the MSD Board of Education decided to terminate his contract, it needed to notify Husbands in writing

---

[173] R. at 1343-49 (Hr'g Tr. at 448-54) (reading portions of DOE Ex. 11.6-11.8).
[174] R. at 1262-1327 (Hr'g Tr. at 367-432).
[175] *See* R. at 1871-72 (Ex. P-3).

and prove the reasons for termination. If he was to be terminated, he should have had a hearing before a Hearing Officer and the MSD Board of Education.[176] According to Husbands, the MSD Board of Education's December 2015 notification of non-renewal did not include a reason, the Board never gave him a reason, and Husbands never had the opportunity for a hearing.

Husbands testified that he was aware of Child 6's accusations, but denied ever giving her notes.[177] Although he taught Child 6's tenth grade Civics class, he never had an opportunity to pass Child 6 notes because a Teacher Assistance for Mastery ("TAM") teacher helped plan and teach the class. According to Husbands, the TAM teacher "essentially passed out most of the papers throughout the semester, when [he] was teaching or when [he] was getting ready to introduce things," "a lot of times she graded" assignments, and helped instruct breakout groups.[178] Husbands testified that the TAM teacher never saw any notes and "would strongly assert that she never saw [him] give a note."[179] Husbands testified he saw two of the notes.[180] He thought the note about tutoring in the trailer was odd because it contained contractions and he never uses contractions, and he did not have a key to a trailer.[181] Husbands

---

[176] R. at 1283 (Hr'g Tr. at 388).
[177] *Contra supra* pp. 35-40.
[178] R. at 1286-87 (Hr'g Tr. at 391-92).
[179] R. at 1287 (Hr'g Tr. at 392).
[180] *Id.* (shown notes and told had more notes).
[181] *Id.* at 1288 (taught sixth grade writing rubric, very particular about writing, corrected contractions in assignments, and never used contractions in emails).

testified that when he taught students outside of school hours he always made sure that he was never alone with a student.[182] Husbands also found it odd that when he collected notebooks, Child 6 never gave him her notebook. Husbands testified that there was no need for him to give Child 6 assistance because she worked with Parisi and she was a B student.

Husbands next responded to (and attempted to discredit) the testimony concerning the incidents involving Child 5.[183] Husbands testified that Child 5 was one of his students and when she was in high school and she repeatedly asked him if she could babysit Child 7 and her brother. Husbands "always said no" because he and Mother 7 "never went out."[184] Husbands testified that Child 5 never babysat for him while she was in high school. Husbands did not hire high school students to babysit because it made him uncomfortable. It was only after she graduated that she babysat. He did not know how he and Child 5 came into contact after she graduated.

Next, Husbands turned to Mother 1's testimony.[185] He testified that Mother 1 is Husbands' former sister-in-law. Husbands never had a good relationship with Mother 1 and her husband, and he "sincerely did not like the family."[186]

---

[182] *See* R. at 1292-93 (Hr'g Tr. at 397-98).
[183] *See supra* pp. 31-33, 40-41.
[184] R. at 1291-92 (Hr'g Tr. at 396-97).
[185] *See supra* pp. 7-9 (Child 1), 9-15 (Mother 1).
[186] R. at 1295 (Hr'g Tr. at 400).

Husbands testified that Child 1 looked forward to coming over and spent a lot of time at his house, as much as four nights a week during the summer and weekends during the school year.[187] Husbands said he and Child 1 had a mostly positive relationship, but he did not like it when she and Child 7 got into physical altercations or when Child 1 never wanted to do what Child 7 wanted to do. According to Husbands, Child 1 (not Child 7) always asked him to do activities with her and Child 7. Husbands admitted he laid on the air mattresses with the girls but said he always laid next to Child 7, and "only when it was family."[188]

Husbands claimed that Mother 1's testimony that she and her family stopped interacting with Husbands during spring break was "absolutely not accurate" because they all went to Funland and she posted on social media about the trip.[189] He also believed that he had hung out with Mother 1's family but could not remember specifics. Husbands believed that Mother 1 and Mother 7 conspired against him, noting that only one month before Mother 1 accused him of being inappropriate and his arrest, Mother 1 talked on social media about having a good time while hanging out with Husbands' and his family.[190]

---

[187] Husbands claims that Mother 1 "kind of water[ed] that down," but his testimony about how often the children hung out is similar to Mother 1's testimony. *See supra* pp. 9-10.
[188] R. at 1296 (Hr'g Tr. at 401).
[189] R. at 1297-98 (Hr'g Tr. at 402-03). *Contra supra* pp. 12-14.
[190] R. at 1300-01 (Hr'g Tr. at 405-06).

Next Husbands addressed Mother 1's testimony that she found it odd he texted Child 1 during a family party about sleeping over at his house.[191] According to Husbands, Child 7 asked him if Child 1 could sleepover. Husbands said it was okay, but Child 1's parents had to agree to let her sleepover.[192] When he texted Child 1, he was in the same room as Child 1, Child 7, and their brothers, and everyone was on their phones. Husbands admitted the behavior was odd, but he thought it would be funny to text Child 1 because it was like a TV commercial.[193] According to Husbands, in the TV commercial, there was a family sitting around the table eating dinner, and everyone was texting each other instead of talking. Husbands thought it would be funny to reenact the commercial because the children were sitting in the same room texting and not verbally communicating.[194] Husbands testified that when Child 1 saw his text she gave him a look because they were "in the same room, five feet away from [each other]."[195] At some point after texting Child 1, he left the kitchen and joined the adults in the other room. Similar to Mother 1's testimony, Husbands testified that while he was in the other room Child 1 came into the room

[191] *See supra* pp. 10-12; *see also* R. at 959 (Hr'g Tr. at 124).
[192] Husbands never denied Mother 1's claim that Child 7 never spoke to Child 1 about sleeping over.
[193] R. at 1303-05. Husbands testified that he also texted with his nephew.
[194] Husbands testified that he believed it was ridiculous for a family to sit together and just be on their phones. R. at 1304.
[195] R. at 1303 (Hr'g Tr. at 408).

58

to ask Mother 1 about sleeping over. According to Husbands, Mother 1 said something like "[n]o, honey, or [n]o, sweetie, tonight is not good, or not tonight."[196]

On the night of the incident with Child 1, Husbands said he heard a noise, saw Child 7's door was unlocked, went in and saw Child 7 sleeping on the floor and Child 1 sleeping in the bed. Child 1 woke up and "got freaked out" when Husbands covered her up. According to Husbands, Child 1 did not scream. Instead, Child 1 walked over and talked to Mother 7, Child 7 never woke up, and Husbands "went right back to bed."[197] Husbands testified that a screwdriver would not unlock the bedroom door because it was too big to fit in the opening for the locking mechanism.

In response to testimony about Mother 7's relationship with the mothers of the alleged victims, Husbands testified that Mother 7 and the other mothers are friends. According to Husbands, Mother 4 is Mother 7's best friend; Mother 3 would go out drinking with Mother 7; Mother 1 and Mother 7 would hang out; and Mother 2 is Mother 7's coworker. Husbands stated that even though Mother 1 testified that she never hung out with Mother 7, they did hang out. Further, according to Husbands, while Mother 3 "flat-out denies ever hanging out with [Mother 7]," Mother 3 and Mother 7 "got together for several weeks, a couple months before

_____

[196] R. at 1304 (Hr'g Tr. at 409). According to Husbands, Mother 1 testified that she and Child 1 went into a different room to talk about sleeping over. *Id. Contra* R. at 959 (no mention of leaving the room).
[197] R. at 1307.

59

everything happened to [him]."[198] Husbands further testified that one night Mother 3 and Mother 7 went "bar hopping" with their daughters.[199] Husbands claimed Mother 3's testimony that Mother 7 called her at work and told her about the accusations against Husbands is inaccurate.[200] According to Husbands, Mother 7 told him that Child 3 told Mother 3 that Husbands touched her, thus Mother 3's testimony differs from what Mother 7 told him.[201] In response to Mother 3's testimony that Mother 7 caught him looking up young women online, Husbands testified that he never looked at young women online but that he had lots of friends online and Mother 7 accused him of cheating.[202]

Husbands testified that every allegation was false and that he never touched any of the children.[203] He believes that the accusations were made because of his custody battle with Mother 7 and because she was embarrassed that he caught her cheating. Husbands noted that eight days after he caught Mother 7 cheating, the

---

[198] R. at 1308-09 (Hr'g Tr. at 413-14).

[199] Husbands testified that Mother 7 went to AA. R. at 1309 (Hr'g Tr. at 414). Husbands said he knew that Mother 3 and Mother 7 hung out because Child 7 told him about "how she was hanging out with [Child 3]" and Mother 7 told him she hung out with Mother 3. R. at 1312 (Hr'g Tr. at 417).

[200] *Supra* p. 24.

[201] Husbands also testified that it was strange when Child 3 referred to him by his first name during the criminal trial because she had never done that before.

[202] Husbands testified that he is not dating, trying to mess with women, or going after women online. R. at 1316 (Hr'g Tr. at 421).

[203] The PSB specifically noted in its Final Order that it did not find Husbands' testimony that he did not have inappropriate contract with Child 1 credible. *IN RE E.H.*, No. 2017-01, at 8 (Del. PSB) (R. at 2131-32).

criminal investigation began.[204] Husbands testified in detail about his wife's alleged cheating. Husbands and his family attended a baseball tournament in June 2015. Late in the evening of June 14th into early morning of June 15th, Husbands attempted to contact Mother 7 several times. Around 1:30 a.m., he went to the front and then the back of the hotel to find her. As he walked out back, Husbands saw Mother 7 parking a car and texting. Husbands said that he tried to take her keys and phone because she had been drinking. Husbands claimed that when Husbands reached for the keys, Mother 7 stabbed him with the keys. Husbands testified that after this altercation, Mother 7 confessed to cheating on him. Then, on June 23, 2015, the police began contacting the alleged victims and their families. Approximately four days after Husbands was arrested, Mother 7 filed for custody.

As a result of the accusations, Husbands lost his teaching and coaching jobs, his contract was not renewed; his license was being revoked; his home was almost foreclosed; he lost his camper; Mother 7 ruined his credit, opened credit cards, and took money; he missed family trips and experiences; he and Child 7 are bullied; he receives death threats; Child 7 is ostracized by Mother 7's family; he cries daily; and Child 7 and her brother cry more than they used to. Husbands and Mother 7 agreed to a custody arrangement just prior to a custody hearing, which gave him 100 percent custody of Child 7 and 50 percent custody of Child 7's brother.

---

[204] R. at 1320 (Hr'g Tr. at 425).

<u>Kevin Dickerson Affidavit</u>[205]

On the third day of the Hearing, Husbands submitted the sworn affidavit of Kevin Dickerson. Dickerson is the current MSD Superintendent. Dickerson did not testify and was not subject to cross-examination. His affidavit stated that Husbands' contract concluded in 2016. He further stated that the MSD Board of Education never made any findings nor drew any conclusions about Husbands' criminal charges. According to Dickerson, "[t]he District elected to not renew [Husbands'] employment contract because of the pending criminal charges, not because it concluded that [Husbands] ever committed a crime."[206]

## IV. STANDARD OF REVIEW

Pursuant to the Delaware Administrative Procedures Act (the "APA"), the Court has jurisdiction to hear an appeal of an Administrative Board's final order.[207] When factual determinations are at issue, the Court "shall take due account of the experience and specialized competence of the agency and of the purposes of the basic law under which the agency has acted."[208] On appeal, "the Court is not authorized to make its own factual findings, assess credibility of witnesses or weigh

---

[205] R. at 1873-74 (Ex. P-4).
[206] R. at 1873 (Ex. P-4).
[207] 29 *Del. C.* §§ 10102(4), 10142(a), 10161(a)(46).
[208] 29 *Del. C.* § 10142(d). *See Hoopes v. Del. Council of Real Estate Appraisers*, 2006 WL 3308203, at *1 (Del. Super. 2006) ("The Court does not re-weigh evidence, nor does it substitute its judgment for the factual determinations made by the Board or Council below.").

62

the evidence."[209] The Court's limited appellate review consists of examining the administrative record to determine whether substantial evidence supports the Board's findings of fact and conclusions.[210] "Substantial evidence is evidence which affords a substantial basis of fact from which the fact in issue can be reasonably inferred."[211] If the Court finds the Board's findings and conclusions are "based upon substantial evidence and there is no error of law, the board's decision must be affirmed."[212]

## V. CONTENTIONS

On appeal, Husbands asserts several arguments. First, Husbands argues that the PSB's Final Order is not supported by substantial evidence because it rests entirely on hearsay.[213] Second, Husbands maintains that the PSB committed legal error in finding that he was terminated or dismissed from his employment,[214] and lacked substantial evidence to support its finding that he was terminated or dismissed because he engaged in sexual offenses against a child.[215] Third, Husbands argues

---

[209] *Sokoloff v. Bd. of Med. Practice*, 2010 WL 5550692, at *5 (Del. Super. 2010). It is settled law in Delaware that the Board has the discretionary authority to determine witness credibility and "choose the evidentiary weight to be accorded to a witness' testimony." *McCormick v. Bd. of Educ. for State*, 1998 WL 960732, at *4 (Del. Super. 1998).

[210] *Johnson v. Chrysler Corp.*, 213 A.2d 64, 66-67 (Del. 1965); *see also General Motors Corp. v. Freeman*, 164 A.2d 686, 689 (Del. 1960).

[211] *McCain v. Del. Council on Real Estate Appraisers*, 2009 WL 1515594, at *2 (Del. Super. 2009) (citations omitted).

[212] *Sokoloff*, 2010 WL 5550692, at *5 (citation omitted); *see also PAL of Wilmington v. Graham*, 2008 WL 2582986, at *3 (Del. Super. 2008).

[213] Op. Br., E-file 62230374, at 5-10.

[214] *Id.* at 10-22.

[215] *Id.* at 22-26.

that the Court should find the PSB has the authority to determine that the DOE proceeded in bad faith with his license revocation and remand the matter to allow the PSB to determine whether Husbands should be awarded attorney's fees and costs.[216]

## V. DISCUSSION

A.   The PSB's Final Order Does Not Rest Entirely on Hearsay

1. Introduction

Husbands argues the PSB's Final Order is not supported by substantial evidence because the DOE and the H.O. relied entirely on hearsay evidence.[217] According to Husbands, all statements relating to accusations of misconduct he committed against children are records of statements or testimony regarding statements made outside of the Hearing, which the DOE offered for the truth of the matter asserted.[218]

Under Delaware Rules of Evidence ("D.R.E.") 801(c), "hearsay" is defined as a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the an inadmissible statement.   Under D.R.E. 802, hearsay is not admissible except as provided by law or by the Delaware Rules of Evidence.   Hearsay evidence is

---

[216] *Id.* at 26-30.
[217] Op. Br. at 5-9.
[218] *Id.* at 5.

admissible in an administrative hearing,[219] but a board "may not rely upon such evidence as the sole basis for its decision."[220] As discussed below, a review of the record makes clear that the PSB did not rely solely on hearsay in reaching its decision, and its decision is supported by substantial evidence.

2. Prior Sworn Testimony of the Alleged Child Victims

As noted above, at the Hearing, the DOE introduced the prior sworn testimony of the four young girls who testified against Husbands at his criminal trial.[221] On appeal, Husbands preliminarily argues the DOE offered no evidence that these witnesses were "unavailable" under D.R.E. 804(b)(1),[222] and therefore, their testimony was inadmissible hearsay. First, this argument ignores well-settled law providing that hearsay evidence is admissible in administrative hearings. And second, a review of the Record reveals that Husbands never objected to the

---

[219] See Designs v. Willey, 2011 WL 2535794, at *3 (Del. Super. 2011). "The purpose of allowing Boards to accept evidence that would not normally be allowed in a trial setting is to free the boards and commissions from technical rules preventing the invalidation of administrative orders on appeal when such evidence was presented before them." Id.

[220] Larkin v. Gettier & Assoc., 1997 WL 717792, at *3 (Del. Super. 1997) (citing Geegan v. Unemployment Comp. Comm'n, 76 A.2d 116, 117 (Del. 1950)); see also LaVelle v. Kent County Personnel Admin. Bd., 1997 WL 719134, at *8 (Del. Super 1997). Basing a decision only on hearsay is plain error and an abuse of discretion. See Liberto v. Delaware Violent Crimes Compensation Bd., 1992 WL 52193, at *2 (Del. Super. 1992).

[221] DOE Ex. 9. The four young girls were cross-examined by Husbands' counsel.

[222] See Op. Br. at 6. D.R.E. 804(b)(1) states, in pertinent part: (b) Hearsay exceptions. The following are not excluded by the hearsay rule if declarant is unavailable as a witness: (1) Former testimony. Testimony given as a witness at another hearing of the same or different proceeding, . . . if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross or redirect examination.

65

admission of the prior sworn testimony based on the availability of the child witnesses.[223] Rather, Husbands raised only a general hearsay objection:

> Husbands' Counsel: "First I would like to . . . lodge an objection for the record. To the extent that there are only people remaining on the list for the State's testimony who are giving statements of statements, the entirety of the State's case is made of hearsay *and there can be no conclusions made by administrative tribunal on the basis of hearsay. It seems those are the only people left on the witness list. And I wanted to make that observation now and renew it at the end, and I will continue with my cross examination. . . .*"
>
> DOE's Counsel: "And I would like to state for the record that we will be entering into evidence sworn testimony that has been cross examined from a trial and that is not hearsay. *It is absolutely not hearsay and that will be entered. And the witnesses are all witnesses that have full knowledge of what happened in this trial and through their daughters that this is not just hearsay. And the strict rules of evidence do not apply. . . .*"
>
> . . . .
>
> Husbands' Counsel: "Continuing with the cross examination."[224]

---

[223] Nowhere in the Record leading up to the Hearing, or during the Hearing, did Husbands cite D.R.E. 804(a) or D.R.E. 804(b)(1), or object on grounds that the DOE failed to establish that the children were "unavailable." *See* Ans. Br., E-File 62297737, at 12; *see also* Husbands' Letter, E-File 63155168 (Apr. 10, 2019). Despite the DOE's argument at the Hearing that the sworn statements were not hearsay or fell under an exception to the hearsay rule, the H.O. ruled that the prior sworn testimony was hearsay, but considered the testimony anyway because of the abundance of non-hearsay evidence in the record. *See* R. at 2018-20 (H.O. ruling). The PSB considered the DOE's argument that the children's prior sworn testimony constituted out-of-court statements of abuse under 11 *Del. C.* § 3513. The PSB noted that under § 3513(b)(2), an out-of-court statement may be admitted if the child is found to be "unavailable" to testify on the grounds that there is a "[s]ubstantial likelihood that the child would suffer severe emotional trauma from testifying at the proceeding" and the statement "is shown to possess particularized guarantees of trustworthiness." R. at 2130-31. The PSB also noted that pursuant to 11 *Del. C.* § 3513(c), a child's unavailability to testify "must be supported by expert testimony." R. at 2130-31. Because the DOE offered no expert testimony to support that the four children were "unavailable," the PSB found that the hearsay exception under § 3513 did not apply. The PSB considered the girls' testimony nonetheless because that evidence was not the sole basis for its decision. *Id.* at 2131.

[224] *See* R. at 976-77 (emphasis added); *see also* Husbands' Letter, E-File 63155168 (Apr. 10, 2019).

D.R.E. 103 states:

> **(a) Preserving a Claim of Error.** A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and:
> (1) if the ruling admits evidence, a party, on the record:
> (A) timely objects or moves to strike; and
> (B) states the specific ground, unless it is apparent from the context; or
> (2) if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context.[225]

Thus, Husbands may only claim error on appeal if the ruling to include the evidence affected a substantial right of his,[226] he timely objected, and he stated the specific ground, unless it was apparent from the context. Husbands failed to state the specific ground of "unavailability" and it was not apparent from the context. His violation of D.R.E. 103(a)(1)(B) denied the DOE the opportunity to issue a proffer as to the children's unavailability and offer expert testimony as required under 11 *Del. C.* § 3513, or in the alternative, to call the minor children to testify live at the Hearing. Husbands failed to present a claim of error on this issue.[227] Turning to Husbands'

---

[225] In Appellees Answering Brief, the DOE incorrectly quotes the previous version of D.R.E. 103, which was amended in 2017 to its current version.

[226] The alleged error did not affect a substantial right of Husbands given all the other evidence supporting the PSB's decision.

[227] The alleged error did not affect a substantial right of Husbands given all the other evidence supporting the PSB's decision. *See Moss v. State*, 2017 WL 2806269 (Del. 2017). In *Moss*, a criminal case involving a much higher burden of proof (beyond a reasonable doubt as opposed to preponderance of the evidence), the Delaware Supreme Court rejected an argument similar to the one Husbands makes here. In *Moss*, the Delaware Supreme Court held that the admission of an unavailable declarant's text messages in a criminal trial was not reversible error where the

next argument – that the DOE's case, and by extension the PSB's decision, rests entirely on hearsay evidence, it does not. Not even close. Husbands' argument in this regard ignores the substantial non-hearsay evidence supporting the PSB's decision, including, *inter alia*, compelling corroborative evidence of the non-hearsay portions of the of the mothers' Hearing testimony. To illustrate, below the Court has taken the mothers' Hearing testimony and excluded statements made to the mothers and left in the mothers' responses to others' statements and events. In other words, the Court has excluded statements that were, assuming *arguendo*, offered by the DOE for the truth of the matter asserted, and left in testimony for the sole purpose of showing the effects on the listener (non-hearsay).[228]

### 3. The Mothers' Non-Hearsay Hearing Testimony

Mother 1[229]

- Beginning in the Spring of 2014, Mother 1 was upset because she did not understand why Child 1 no longer wanted to go to Husbands' house. This created tension, which grew to the point where Mother 1 and Child 1 argued and Mother 1 would "kind of make [Child 1] go."

---

defendant raised a global hearsay objection at trial and was not significantly prejudiced because substantial evidence supported his conviction. *Id.* at *4-5.

[228] *See Estate of Rochester v. Reyes, M.D.*, 2015 WL 7823132 (Del. Super. 2015) (holding out-of-court statements offered to show their effect on listener is "nonhearsay" and admissible if not barred under D.R.E. 403); *see also Sanabria v. State*, 974 A.2d 107 (Del. 2009); *Atkins v. State*, 523 A.2d 539 (Del. 1987).

[229] R. at 1986-89 (H.O. summary); *see also* R. at 955-86 (Hr'g Tr. at 120-51).

- In December 2014, things started to become strange when Child 1 did not want to go to Husbands' house for a sleepover, Mother 1 told Child 1 she did not have to go. That night, when Child 1 started to cry, Mother 1 asked what was going on. Child 1 told Mother 1 why she was crying and why she did not want to go to Husbands' house. In response, Mother 1 was in shock. Mother 1 asked Child 1 how Husbands touched her. Child 1 responded. After calming Child 1, Mother 1 told her husband what Child 1 told her. Child 1 told Mother 1's husband the same thing she had told Mother 1.

- After this, Mother 1's children did not go to Husbands' house from that point until April 2015.

- In April 2015, when Mother 1 dropped Child 1 off for a sleepover with Child 7 at Husbands' house, Mother 1 told Mother 7 that Child 1 was not comfortable around Husbands. The following morning, Mother 1 told Mother 7 what Child 1 had told her about Husbands touching her. Mother 1 and her husband confronted Husbands and told him everything that Child 1 had told them.

- Mother 1 testified that her children never went back to Husbands' house after that confrontation, and Mother 1 and her family cut all ties with Husbands.

- Mother 1 testified she was present when Mother 7 contacted Child Protective Services.

69

- Family Services investigated Mother 1 and her husband for not reporting the incident involving Husbands and Child 1, and Mother 1 and her husband were cleared.

- Mother 1 testified that Child 1 had to go to the CAC to be interviewed. While Child 1 was interviewed, Mother 1 was in the building but was not allowed in the interview room during Child 1's interview.

- Mother 1 testified that Child 1 was called to testify at Husbands' criminal trial and it was extremely difficult for Child 1. Child 1 went to counseling shortly after the criminal trial and was still in counseling as of the time of the Hearing.[230]

Mother 2[231]

- Mother 2 testified that she received a call from Det. Truitt in 2015. In response to that call, Mother 2 took Child 2 to the CAC to be interviewed. Mother 2 was in the building during her daughter's interview but was not in the interview room while Child 2 was interviewed.

- Following Child 2's CAC interview, the interview team talked to Mother 2 about what Child 2 alleged against Husbands. In response to those

[230] R. at 971-72 (Hr'g Tr. at 136-37).
[231] R. at 1039-67 (Hr'g Tr. at 204-32).

conversations, Mother 2 "completely lost her mind" and needed an hour to collect herself before talking to Child 2 in the car on the way home.

- During the car ride, Mother 2 told Child 2 that men are not allowed to touch her in her vaginal area and that it was not okay for anyone to do that. Mother 2 also told Child 2 that what Husbands did was a crime and he would pay for it.

- Mother 2 testified that Child 2 received counseling and that the ordeal was a strain on the family. Mother 2's husband also attended counseling.

- Mother 2 advised Child 2 to be cordial with Child 7 during Husbands' criminal trial but to stay away and not be involved with Child 7.

Mother 3[232]

- According to Mother 3, she received a phone call from Mother 7. In response to that phone call, Mother 3 became very upset, started crying, left work, picked up Child 3, and took her to State Police Troop 7.

- At Troop 7, Mother 3 told the police what Mother 7 had told her on the phone. After Mother 3 and Child 3 left Troop 7, Mother 3 dropped Child 3 off, and headed to Troop 4 where she spoke to another police officer.

- The CAC interviewed Child 3.

---

[232] R. at 1989-91 (H.O. summary); *see also* R at 987-1014 (Hr'g Tr. at 152-79).

- Mother 3 had a conversation with Mother 7 during which Mother 3 asked her if Husbands had inappropriately touched anyone else. Mother 7 responded.

- After this, Child 3 never went back to Husbands' house for a sleepover.

- Mother 3 provided the detective assigned to investigating Husbands' criminal case with the names of other girls who could have been affected.

- Mother 3 testified that she was the first one to go to the police about Husbands, and she knew there were other girls this happened to going back three or four years.

Mother 4[233]

- Mother 4 received a phone call from Mother 7. In response to what Mother 7 told her, Mother 4 instructed Mother 7 to call the police and the 800 number hotline because Mother 7 was a mandatory reporter.

- Two days later, Mother 4 told Child 4 what Mother 7 had told her on the phone. Mother 4 told Child 4 that she had nothing to worry about because Child 4 had never been alone with Husbands. Child 4 said something in reply, and in response, Mother 4 asked Child 4 why she had never told Mother 4 what happened with Husbands. In response to Child 4's reply, Mother 4 scheduled a CAC interview the next day and Child 4 was interviewed.

---

[233] R. at 1991-93 (H.O. summary); *see also* R. at 1016-39 (Hr'g Tr. at 181-204).

- Mother 4 feels Husbands cannot be a teacher or a principal and that what happened is disgusting.

***

As the DOE correctly notes, and the Record supports:

> the sworn testimony of the child victims was bolstered by the testimony of four mothers who testified live before the Hearing Officer, providing their own first-hand impressions of the devastation they witnessed in their daughters as a result of Husbands' [conduct]. These women described how Husbands' actions hurt their families causing shock, sleeplessness, distrust, and the need for counseling.[234]

In its Final Order, the PSB stated that the mothers' Hearing testimony concerning their daughters' emotional responses and need for counseling after Husbands had unlawful sexual contact with their daughters "lent additional credence to the girls' testimony."[235] The Court agrees and notes that the mothers' reactions and actions (which are not hearsay) not only strongly corroborate the children's claims against Husbands, but constitute in their own right substantial evidence of unlawful sexual contact with minors by Husbands.

Stripped of hearsay, the undisputed evidence established that in response to what Children 1-4 told them, Mother's 1-4 were upset, took their young daughters to be interviewed by the CAC, allowed them to be interviewed by the police, and permitted them to testify at Husbands' criminal trial. The mothers did so knowing

---

[234] Ans. Br., E-File 62297737, at 14-15 (internal citations omitted).
[235] R. at 2132.

73

that their children would be extensively questioned about the accusations and that their credibility would be challenged through cross-examination in front of a jury. They knew their young daughters would have to describe in painful detail what Husbands did to them and how it made them feel. This highly relevant and compelling non-hearsay evidence, standing alone, is substantial evidence supporting the PSB's decision.

But there is much more. In addition to the non-hearsay evidence presented through the mothers' testimony. There is also the non-hearsay evidence of Child 7's statements from the CAC interviews.[236] The statements Child 7 made in her CAC interviews (that were admitted as non-hearsay evidence in Husbands' criminal trial pursuant to 11 *Del. C.* § 3507 and D.R.E. 801(d)(1)(C)) were in the record before the H.O., and Child 7 testified (at Husbands' request) and was available for cross-examination at the Hearing. Pursuant to D.R.E. 801(d)(1)(A), a declarant-witness's prior statement is not hearsay if the declarant testifies and is subject to cross-examination about a prior statement, and the statement is inconsistent with the declarant's testimony.

---

[236] *See supra* pp. 51-54.

74

**B. Husbands was "Terminated or Dismissed" Pursuant to 14 *Del. C.* § 1218(b)(2) for Sexual Offenses Against Children**

Husbands argues that the non-renewal of his contract does not constitute a "termination" or "dismissal" under 14 *Del. C.* § 1218 and, even if it does, there is no substantial evidence to support the PSB's finding that he engaged in sexual offenses against children. Husbands claims that if the PSB's Final Order is permitted to stand, "then the mere accusation of criminal activity would be sufficient to end a licensee's career, and in fact will end a licensee's career in virtually every case."[237]

Pursuant to 14 *Del. C.* § 1218(b)(2), one cause for revocation is if a license holder "[i]s terminated or dismissed for a sexual offense against a child."[238] In order for a license holder to be disciplined under 14 *Del. C.* § 1218(b)(2), the DOE is required to prove by a preponderance of the evidence that: (1) the license holder was terminated or dismissed; and (2) the termination or dismissal was for a sexual offense against a child.

1. Terminated/Dismissed

In support of Husbands' argument that he was not "terminated" or "dismissed," he asserts (without citation to any case law) that the plain meaning of "terminated" and "dismissed" required his employer, the MSD, to take "some affirmative action to remove him from his position or discontinue his

---

[237] Op. Br. at 12.
[238] 14 *Del. C.* § 1218(b)(2) (2017).

75

employment."[239]  He further asserts that "[a] contractual expiration should not be tantamount to termination or dismissal.[240]

The terms "terminated" and "dismissed" are not defined in Chapter 12. As the H.O. correctly noted, under Delaware law, "undefined words in a statute must be given their ordinary, common meaning"[241] and "words and phrases should be read with their context."[242]  As the H.O. also correctly noted; in the context of this case a licensure disciplinary action; "terminate" means to "discontinue the employment of"[243] and "dismiss" means "to remove from position or service."[244]  As explained below, by refusing to renew Husbands' contract, the MSD "terminated" Husbands' employment under 14 *Del. C.* § 1218(b)(2).  And contrary to Husbands' argument, although neither the statute nor Husbands' contract requires that termination involve an "affirmative act," the MSD Board of Education's decision not to renew constitutes such.

Under Paragraph 5 of Husbands' contract,[245] the MSD Board of Education was required to notify him in writing no later than six months prior to the expiration

---

[239] Op. Br. at 11.  Husbands cites to no legal authority supporting this argument.
[240] Op. Br. at 11.
[241] H.O. Decision at 39 (R. at 2011) (citing *New Castle Cnty. Dep't of Land Use v. Univ. of Del.*, 842 A.2d 1201, 1207 (Del. 2004)).
[242] 1 *Del. C.* § 303.
[243] H.O. Decision at 39 (citing MERIAM-WEBSTER DICTIONARY, http://www.meriam-webster.com/dictionary/terminate).
[244] *Id.* (citing MERIAM-WEBSTER DICTIONARY, http://www.meriam-webster.com/dictionary/dismiss).
[245] Paragraph 5 of Husbands' employment contract states:

of the contract of its intent not to renew the contract. If the MSD Board of Education failed to notify Husbands of its intent not to renew, Husbands' contract would have been automatically extended for one year. Although Husbands' contract provides requirements for terminating the contract, including a termination hearing, such requirements do not apply if the MSD Board of Education decides not to renew the contract.

Under Paragraph 6 of Husbands' contract, the MSD Board of Education "shall not terminate [the contract], prior to the expiration date, except for good and just cause and shall provide the opportunity for a fair hearing before [the MSD Board of Education or its hearing officer]." The termination of Husbands' contract occurred at the expiration of the contract, not prior to the expiration of the contract. Had it been the latter, Husbands would have been entitled to "a written statement of the reasons for termination" or a termination hearing under Paragraph 6. However, by the express terms of Husbands' contract, he was not entitled to a termination hearing because the contract was not terminated prior to the contract expiring in June 30, 2016.

---

**Expiration of Agreement.** Failure on the part of the Board or the Administrator to notify the other in writing by certified mail, no later than six (6) months prior to the expiration of the Agreement, of either party's intent not to renew the Agreement, will automatically result in a one year extension of the existing Agreement.

*See* R. at 1871-72 (P-3) (Husbands' School Administrators Contract).

The MSD Board of Education acted under Paragraph 5 of the contract in December 2015, six months prior to the contract's expiration. It discontinued Husbands' employment (and removed him from service as an administrator) by not renewing his contract after it expired on June 30, 2016. Through Dr. Walmsley's December 22, 2105 letter to Husbands, Husbands was notified that the "Milford School District Board of Education is informing [Husbands] that [his School Administrator Contract] will not be renewed beyond the expiration date." By virtue of this notice, Husbands' employment with the MSD was discontinued effective June 30, 2016. Absent the action taken by the MSD, Husbands would have been employed at least through June 30, 2016. Consequently, Husbands was terminated and dismissed from service. The non-renewal caused a cessation of employment and, therefore, constitutes a termination or dismissal under 14 *Del. C.* § 1218(b)(2).

2. Sex Offenses Against Children

Husbands argues that the PSB lacked substantial evidence to support its determination that he was terminated because of sexual offenses against children. The Court disagrees. There is substantial evidence to support the PSB's finding in this regard. Shortly after Husbands was arrested and charged with sexual offenses against children, Dr. Kohel and Dr. Walmsley learned of the charges from

78

DELJIS.[246] Four days after Husbands was charged, Dr. Walmsley notified Husbands he was suspended without pay because of "misconduct which is the subject of a pending police investigation."[247] According to Dr. Walmsley, Husbands' suspension was based solely on the charges and was for the safety of students. The then-Secretary of Education automatically suspended Husbands' Continuing License and Standard Certificates effective the date of Husbands' arrest. That order indicates that Husbands' was arrested and charged with sexual offenses again children under the age of thirteen.[248] Dr. Kohel, who signed Husbands' contract as the Executive Secretary of the MSD Board of Education,[249] testified that Husbands' contract was not renewed because of his pending criminal charges – sexual offenses against children – and bond conditions prohibiting Husbands from having contact with persons under the age of eighteen and MSD property. Dr. Walmsley testified that Husbands' contract was not renewed because Husbands' pending criminal charges prevented him from working. Both Dr. Kohel and Dr. Walmsley testified there were no staff or budget cuts, and Dr. Walmsley testified he was not aware that

---

[246] *See supra* pp. 42, 44 and note 2. As previously noted, the Notice from DELJIS contained the Affidavit of Probable Cause. "Probable Cause" exists where the facts and circumstances within the arresting officers' knowledge and of *which they have reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been committed. See Tolson v. State*, 900 A.2d 639, 643 (Del. 2006) (citations omitted) (emphasis added).
[247] *See* R. at 1661 (DOE Ex. 15).
[248] *See* R. at 1664-65 (DOE Ex. 18.2-18.3).
[249] *See* R. at 1872.

Husbands had any performance issues. The MSD Board of Education could and did draw reasonable conclusions based on the Complaint and Warrant, and the Affidavit of Probable Cause provided with the DELJIS report.[250] It concluded that Husbands engaged in unlawful sexual contact with children under the age of thirteen, he could not be around children or be on MSD property because of the criminal charges and his bond conditions, and for the safety of students, he had to be terminated or dismissed. Under 14 Del. C. 1218(b)(2), the DOE was required to prove by a preponderance of the evidence that Husbands was terminated or dismissed for a sexual offense against a child. The preponderance of the evidence makes clear that this was the exact and only reason Husbands' contract was not renewed.[251]

---

[250] *See* R. at 1459-62 (DOE Ex. 14.2-14.6).

[251] The Dickerson affidavit submitted by Husbands to refute the claim that he was not terminated or dismissed for a sexual offense is of little probative value and cannot negate or diminish the wealth of evidence to the contrary. Dr. Dickerson did not testify at the Hearing, although the H.O. continued the hearing to allow for his attendance. He was not the superintendent when Husbands was suspended by the MSD or when the MSD Board of Education decided not to renew his contract. His affidavit is silent as to whether he had access to the information upon which the decision not to renew was based on or played a role in the decision making process. His lack of personal knowledge renders his affidavit useless. *See Lundeen v. Pricewaterhouse Coopers*, 919 A.2d 561 (Del. 2007). And last, to the extent Dr. Dickerson offers his opinion that 14 Del. C. 1218(b)(2) required the MSD Board of Education to conclude Husbands committed a crime before it could elect not to renew his contract, there is no such requirement in the statute, and Husbands has acknowledged that 1218(b)(2) does not require a conviction. *See* R. at 2017 (H.O. Decision, at 45).

C.  Husbands' Claim that the DOE Acted in Bad Faith and Therefore, the Court Should Remand this Matter to the PSB

Husbands' final argument is that the DOE knew it had no basis to proceed on his license revocation and, therefore, acted in bad faith. Consequently, Husbands argues that the Court should remand this matter to the PSB so that he may file an affidavit of attorney's fees and costs. According to Husbands:

> As an administrative tribunal, this Court should find that the PSB has the broad equitable authority that is said to be held by other tribunals and quasi-judicial entities to fulfill the purposes of its operating statute.[252] Here, the broad grant of authority provided by the General Assembly to the PSB is that the PSB is to afford a licensee a full and fair hearing.[253] A hearing is initiated without factual or legal support cannot be fair, and the PSB should exercise equitable authority to address that fundamental lack of fairness and award fees and costs to [Husbands] Delaware courts have shifted fees when parties file frivolous motions.[254]

Husband's claim that the DOE "had no basis" to move forward with the revocation and acted in bad faith by doing so is unsupported in the Record and strains credibility. A bad faith claim is a serious claim, not a Hail Mary,[255] and after thoroughly reviewing the entire Record the Court finds that the DOE established by a preponderance of the evidence that Husbands engaged in a sex offense against a

---

[252] *See generally Brice v. State of Delaware Dep't of Correction*, 704 A.2d 1176 (Del. 1998).
[253] 14 *Del. C.* § 1218(k).
[254] *See* Op. Br. at 28 (citing *In re Shawe v. Elting LLC, et al.*, 2016 WL 3951339, at *1 (Del. Ch. 2016)).
[255] A Hail Mary pass is defined as "a long forward pass in football thrown into or near the end zone in a last-ditch attempt to score as time runs out – often used figuratively." *See* MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/Hail%20Mary.

child.[256]  Moreover, a review of the Record refutes Husbands' argument that the "[H]earing was initiated without factual or legal support" and there was a "fundamental lack of fairness" in the revocation process.[257]

Finally, the Court need not address Husbands' argument that the PSB has "broad equitable authority"[258] because, based on the Record, there was no bad faith and there is no reason for the Court to remand.

---

[256] *See* 14 *Del. C.* § 1218(k).  Section 1218(k) provides, in pertinent part:  The burden of proof in a license disciplinary action shall be on the agency taking the official action to establish by a preponderance of the evidence that the license holder has engaged in misconduct as defined by subsection (a) and (b) of this section . . . ."  Subsection (b) includes termination or dismissal for a sexual offense against a child.  11 *Del. C.* § 1218(b)(2).

[257] Reading Husbands' briefing, it is as if he has a different Record before him than the one before the Court.  He appears unable to accept that the H.O. and the PSB did not find him or his claims of conspiracy and witness coaching credible in light of all the evidence.  It is well-settled Delaware law that, on appeal, the Court will not address issues of witness credibility or make its own factual findings.  Rather, the determination of witness credibility rests with the Board, which can choose the evidentiary weight to be accorded each witness' testimony.  *See McCormick v. Board of Educ.*, 1998 WL 960732, at *4 (Del. Super. 1998).

[258] Op. Br. at 28.

## VI. CONCLUSION

For the reasons explained above, the Court finds that the PSB Final Order is supported by substantial evidence, is not based solely on hearsay evidence, and is free from legal error. Accordingly, the PSB Final Order is **AFFIRMED**.

**IT IS SO ORDERED.**

Jan R. Jurden, President Judge

Original to Prothonotary
cc:    Anthony N. Delcollo, Esq.
       Katherine Witherspoon Fry, Esq.
       G. Kevin Fasic, Esq.
       Patricia A. Davis, DAG